# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-02-00030-CV

---

**Qwest Communications International, Inc.; Qwest Communications Corporation; and SP Constructions Services, Inc./AT&T Corp.; AT&T Communications of the Southwest, Inc.; CK Directional Drilling; and Charles Loyd Nelson, Appellants**

**v.**

**AT&T Corp.; AT&T Communications of the Southwest, Inc./Qwest Communications International, Inc.; Qwest Communications Corporation; SP Construction Services, Inc.; C&S Directional Boring Company, Inc.; CK Directional Drilling; and Charles Loyd Nelson, Appellees**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. 97-13778, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

---

## O P I N I O N

Qwest Communications International, Inc., Qwest Communications Corp., and SP Construction Services, Inc. (together "Qwest") appeal a final judgment awarding economic and exemplary damages to AT&T Corporation and AT&T Communications of the Southwest, Inc. (together "AT&T") for damage to an AT&T fiber-optic cable. CK Directional Drilling and Charles Nelson (together "CK") and AT&T also appeal the final judgment, challenging the district court's calculation of damages. We will affirm in part and reverse and render in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1996 Qwest began the construction of a nationwide fiber-optic communication network to compete against AT&T and other communications companies.[1] By the fall of 1997, with the permission of the Texas Department of Transportation, Qwest was laying fiber-optic cable in highway rights-of-way between Austin, San Antonio, and Houston. AT&T fiber-optic cables lay buried in the same rights-of-way. The rights-of-way also accommodate cables, pipes, and lines of various other utility companies. The rights-of-way's narrow width dictates that underground cables be buried near to one another. Qwest informed AT&T of its cable-laying operations, and AT&T had representatives at the various sites to aid in coordination, mark the AT&T cable, and avoid potential damage. This action involves Qwest's cable-laying operations along State Highway 21 between Austin and Seguin.

On September 16, 1997, Qwest severed an AT&T fiber-optic cable. The next month, CK, a subcontractor employed by C&S Directional Boring Company, Inc. ("C&S") to perform boring operations for Qwest, cut the cable a second time.[2] Qwest had contracted with C&S to perform cable-laying operations, and C&S, in turn, had retained CK. A third cut occurred in

---

[1] A fiber-optic communications network is comprised of thousands of miles of underground fiber-optic cable, which carries voice, data, and video telecommunications services.

[2] During boring operations, an operator, using a drilling rig, sends a boring device into the ground and along a predetermined, horizontal path. At a preselected point, the operator turns the bore upwards, drilling a path to the surface. At the exit hole, a larger drilling head and the underground cable are attached to the bore. The boring device reverses direction, widening the hole, and pulls the cable back through the original hole to where it began, thus installing the cable. As the bore travels underground, it transmits a radio signal, which is detected by a worker-operated sensor, such as a "DigiTrak locator," monitored at the surface. The length and depth of the horizontal bores vary depending on conditions; however, the operations that led to the second and third cuts were about 500 feet in length and four to six feet below the surface.

2

December, when CK employees again cut the AT&T cable. AT&T filed suit against Qwest and C&S, seeking damages and an injunction to stop Qwest's cable-installation practices. AT&T obtained a temporary restraining order against Qwest; however, at the courthouse immediately before a scheduled temporary-injunction hearing, Qwest and AT&T reached an agreement (the "Agreement"), which they announced to the district court.

The Agreement embodied a nationwide cooperative plan regarding Qwest's fiber-optic-network installation.[3] AT&T dictated the Agreement into the court record without objection. Later, AT&T filed a motion for contempt and sanctions, alleging that Qwest had violated the terms of the Agreement while conducting cable-laying operations in another state. Qwest then disputed the validity of the Agreement. At a district-court hearing, AT&T presented an "Agreed Order," which it asserted was the exact rendition of the Agreement previously read into the record. Qwest objected, arguing the order was incomplete as a rule 11 agreement. *See* Tex. R. Civ. P. 11 (agreement between parties enforced if in writing, signed, and filed as part of record, or agreement made in open court and entered of record). The district court signed the order and made findings of fact and conclusions of law that the Agreement was an enforceable rule 11 agreement.[4]

---

[3] The Agreement essentially provided: (1) restrictions on excavation work and boring operations by Qwest when in the vicinity of an existing AT&T cable, (2) procedures for Qwest to notify AT&T of its activities, (3) requirements of meetings between Qwest and AT&T, (4) requirements for approval of Qwest's work plans by AT&T, and (5) provisions for AT&T to have a site representative present during Qwest's operations in proximity to an AT&T cable. The Agreement was to expire in three years.

[4] On the last page of the order, the district court annotated that "no enforcement of paragraphs (b) [and] (c) will be entertained until a Feb 25, 26, 1998 hearing on clarification." The court signed a final order on March 25, 1998. The enforcement restriction noted in the first order is of no consequence to this appeal. Both orders were signed by Judge John Dietz.

3

This Court dismissed Qwest's appeal of the order, holding it to be a nonappealable interlocutory order over which we lacked jurisdiction. *Qwest Communications Int'l Inc. v. AT&T Corp.*, 983 S.W.2d 885 (Tex. App.—Austin 1999). The supreme court reversed and remanded the cause to this Court, holding that the order was appealable because it granted a temporary injunction. *Qwest Communications Corp. v. AT&T Corp.*, 24 S.W.3d 334 (Tex. 2000) (citing Act of April 2, 1997, 75th Leg., R.S., ch. 1296, § 1, 1997 Tex. Gen. Laws 4936, 4936-37 (amended 2001) (current provision at Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West 2003)). After remand, this Court dismissed the interlocutory appeal on the joint motion of the parties. *Qwest Communications Int'l Inc. v. AT&T Corp.*, No. 03-98-111-CV (Tex. App.—Austin Oct. 19, 2000, no pet.) (not designated for publication). The case then proceeded to trial in the district court.[5]

The jury awarded economic damages to AT&T for all three cable cuts: for the first cut, the jury awarded $205,187.69 against Qwest, finding that Qwest acted with malice; for the second cut, the jury awarded $339,809.98 against CK; for the third cut, the jury awarded AT&T $143,583.83, with responsibility apportioned between Qwest (20%), C&S (30%), and CK (50%), and found that Qwest and C&S acted with malice. Additionally, the jury found Qwest had breached the Agreement and awarded $317,814 to AT&T. The jury found that at all times C&S was responsible for the conduct of CK, its subcontractor, and that Qwest was responsible for the conduct of C&S. The jury awarded AT&T $350 million in exemplary damages against Qwest and $51,000 in exemplary damages against C&S.[6] After the verdict, the district court advised the parties that the

---

[5] The case was tried before Judge Suzanne Covington, who signed the final judgment.

[6] The parties and the district court use the term "punitive damages" to describe the exemplary damages allowed by the civil-practice-and-remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann.

4

calculation of exemplary damages would not include:  (1) prejudgment interest, (2) breach-of-contract damages, or (3) damages resulting from the second cut; in addition, twenty percent of the damages found arising from the third cut would be included in calculating exemplary damages.  The court also stated that prejudgment interest against CK began on May 5, 2000, the date AT&T amended its petition to name CK as a defendant.  The final judgment employed the formula previously announced by the district court and, in addition, reduced the exemplary-damages award against Qwest to two times economic damages in accordance with the statutory cap on exemplary damages, resulting in exemplary damages of $467,808.91.  The judgment did not toll the accrual of prejudgment interest as to CK's portion of the damages.

By four issues, Qwest challenges:  (1) the legal and factual sufficiency of the evidence supporting the exemplary-damages award; (2) the existence of a rule 11 agreement; (3) the damages award for breach of the Agreement; and (4) Qwest's liability for the negligence of the independent contractors.  AT&T, by two issues, argues that the district court miscalculated the exemplary damages and incorrectly calculated prejudgment interest.  Finally, CK argues that the district court erred in failing to toll prejudgment interest as to the damages awarded against it.

## DISCUSSION

### I.  The Exemplary-Damages Award

By its first issue, Qwest challenges the legal and factual sufficiency of the evidence supporting the jury's award of exemplary damages.  The jury found that Qwest's actions were the

§§ 41.001-.013 (West 1997 & Supp. 2003).  For clarity, we will use the legislature's term.

result of its malice. Specifically, Qwest contends that AT&T did not meet the clear-and-convincing-evidence burden required for such a finding because: (1) a corporation cannot be liable for exemplary damages unless a managerial agent participates in the conduct and (2) there was no proof of malice. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001 (West 1997).

Because AT&T's burden of proof at trial was by clear-and-convincing evidence, our legal-and-factual-sufficiency review must incorporate this heightened standard. In two recent opinions, the supreme court has articulated the standards for conducting a legal-and-factual-sufficiency review when the burden of proof at trial was by the clear-and-convincing standard. *See In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002), *In re C.H.*, 89 S.W.3d 17 (Tex. 2002); *see also Bently v. Bunton*, 94 S.W.3d 561, 597 (Tex. 2002) (for purpose of proving actual malice in defamation action, evidence is clear and convincing if it supports firm conviction that fact to be proved is true).

In *J.F.C.* the supreme court held that the legal-sufficiency review "must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the [plaintiff] bears the burden." 96 S.W.3d at 265-66. The court stated that the a reviewing court, in conducting a legal-sufficiency review, should "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* at 266. Deference to the fact finder's conclusion requires "looking at the evidence in the light most favorable to the judgment [which] means that a reviewing court must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so . . . a court should

6

disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible." *Id.* The court continued, stating:

> This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
>
> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*Id*.

Regarding a factual-sufficiency review under the clear-and-convincing standard, the court opined that "a court of appeals must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing." *Id*. The court held that the inquiry must be "whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the . . . allegations." *Id.* The court then stated:

> a court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. A court of appeals should detail in its opinion why it has concluded that a reasonable fact finder could not have credited disputed evidence in favor of the finding.

*Id.* at 266-67.

In Texas a party may recover exemplary damages if the jury finds the defendant acted with malice. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)(2) (West 1997). Jury Questions 4, 8, and 14 asked whether, by clear-and-convincing evidence, the harm to AT&T from the three cuts resulted from malice. The charge defined malice as:

> [A]n act or omission by [Qwest, C&S, or CK],
>
> (i) which, when viewed objectively from the standpoint of that party at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (ii) of which the party had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

This language tracks the civil-practice-and-remedies code. *See id*. § 41.001(7). The jury found that no party acted with malice with regard to the second cut and no malice on CK's part with regard to the third cut. However, the jury found that the first cut resulted from Qwest's malice and the third cut from the malice of Qwest and C&S.

Malice includes two elements: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998) (citing

8

*Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)).[7] Evidence of simple negligence

is not enough to prove either the objective or subjective elements. *Id.* Under the first element,

"extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but

rather the likelihood of serious injury to the plaintiff. *Id.* Under the second element, actual

awareness means that the defendant knew about the peril, but its acts or omissions demonstrated that

the actor did not care. *Id.* Both elements may be proved by circumstantial evidence. *Id.*

A corporation may be liable for exemplary damages resulting from malice only if the

corporation itself acts with malice. *Id.* A corporation "can act only through agents of some

character." *Id.* A corporation is liable for exemplary damages if it authorizes or ratifies an agent's

gross negligence or if it is grossly negligent in hiring any unfit agent. *Id.* Liability is present if the

corporation acts maliciously through the actions or inactions of a corporate vice principal or officer.

*Id.* at 922; *ONI, Inc. v. Swift*, 990 S.W.2d 500, 503 (Tex. App.—Austin 1999, no pet.). In *Ellender*,

the supreme court applied the vice-principal approach to determine whether a corporation was liable

for exemplary damages. *Ellender*, 968 S.W.2d at 922 (citing *Hammerly Oaks, Inc. v. Edwards*, 958

S.W.2d 387, 389 (Tex. 1997)). A vice principal embodies: (1) corporate officers; (2) those who

have authority to employ, direct, and discharge servants of the master; (3) those engaged in the

---

[7] In *Mobil Oil Corp. v. Ellender*, the supreme court noted that, in 1995, the legislature substituted "malice" for "gross negligence" as a prerequisite for exemplary damages. 968 S.W.2d 917, 921 n.2 (Tex. 1998). The *Ellender* court stated that the definition of malice in section 41.001(7)(B) "mirrors this Court's definition of gross negligence in *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994). Therefore, this opinion's legal sufficiency review of gross negligence is relevant to legal sufficiency review of malice as redefined by section 41.001(7)(B)." *Id.*

9

performance of nondelegable or absolute duties of the master; and (4) those to whom the master has confided the management of the whole or a department or a division of the business. *Id.*

In determining whether acts are directly attributable to the corporation, the reviewing court does not simply judge individual elements or facts. *Id.* Instead, to determine if the corporation acted with malice, the court should review all the surrounding facts and circumstances and "the reasonable inferences the fact finder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages." *Id.*

Qwest asserts that none of its vice principals were involved in the cable cuts and that the evidence is legally and factually insufficient as to the objective element of malice. We disagree. There is ample evidence, when viewed objectively from Qwest's standpoint, that fostering a corporate environment of rapid cable-laying operations in the same rights-of-way and in close proximity to AT&T's cable created an extreme risk of damage to AT&T's fiber-optic system. The jury heard testimony that Qwest's upper management was involved in the project and that they promoted a hurried pace for its completion. Qwest laid its fiber-optic cable within the same highway right-of-way as AT&T, and the Qwest cable was buried about fourteen feet from the AT&T cable. Fiber-optic cables are fragile and expensive conduits that transport enormous amounts of information every second; if damaged, thousands of customers lose service.

Scott Howerton, Qwest's construction manager for work along Highway 21, testified that Qwest was funding its fiber-optic-cable installation by contracting with other communications companies that paid Qwest upon the completion of network segments. In the event Qwest fell behind schedule, it would be liable to pay a penalty to the contracting companies. Howerton stated

10

that he had eleven months, from February 1997 to January 1998, to complete this leg of the installation. He testified as to Qwest's hiring practices, stating that when he arrived in Texas he supervised six Qwest employees, and by September he had hired over one hundred more to facilitate construction. He was the person ultimately responsible for the hiring process in Texas. Howerton stated that Qwest was about two months behind schedule when the first cut occurred.

Moreover, the evidence showed that Qwest's nationwide installation operations had resulted in numerous cuts to other fiber-optic cables and buried utility lines. Danny Bottoms, a former Qwest senior manager, testified about the hurried atmosphere at Qwest to finish the fiber-optic-cable system. He testified that "every member of the management team" at Qwest was pushing to get the job done.

There is also evidence to support the subjective component of malice. John Huffman, the AT&T employee who investigated the first cut for AT&T, testified that after the cut, AT&T attempted to facilitate cooperation between the two corporations. He read into the record a memorandum recounting a telephone conversation between Steve Szabo, AT&T's cable-network manager, and Qwest's "call before you dig" center, during which Szabo requested Qwest's project plan information and the names of construction project managers. AT&T desired the information in an attempt to prevent future cable cuts. Huffman testified that, to his knowledge, AT&T received no information from Qwest after the call. Similarly, Huffman read a second Szabo memorandum into the record where Szabo, after the second cut, wrote that he met with two Qwest representatives, asking them to provide AT&T with project plans and seeking cooperation with Qwest at the work site. The memo stated that Szabo never received any response. Huffman also testified that Szabo

11

communicated with Qwest two more times as well. Thereafter, Szabo talked to another Qwest employee, and this time Qwest indicated that it would cooperate with AT&T. However, the third and final cut occurred shortly thereafter. Huffman testified that between the first and the third cable cuts, AT&T received no meaningful cooperation from Qwest.

Terry Philips, another AT&T employee, supervised crews that were marking AT&T's cable ahead of the crews installing the Qwest cable. She testified that Howerton "[b]asically [] told me that [Qwest] had a schedule to keep, that they weren't going to stop or slow down for [AT&T] and that it was our problem if we didn't have enough people out there to cover them on that job." Howerton's testimony corroborated Philips's. AT&T employee Charles Rotan patrolled AT&T's cable system for malfunctions and mishaps. He testified to observing Qwest crews working twelve-to-thirteen-hour days, often without lunch.

Regarding the first cut, Huffman told the jury that the Qwest employee driving a plow was digging six inches from where AT&T's cable was marked. As the Qwest driver approached a road sign, he turned to go around it. Huffman testified that the AT&T observer told the plow driver to stop because the plow was very close to AT&T's cable and the AT&T observer wanted to verify its location. After a momentary stop, the driver's supervisor directed him to continue; the driver proceeded to cut AT&T's cable. Walt Donovan, a Qwest vice president, testified that the driver's personnel record did not indicate any training by Qwest and that he had not discovered information of any such training. Donovan also testified that the plow driver's first day on the job was only three days before the first cut. Moreover, Howerton testified that the plow driver's supervisor had no

12

construction experience listed in his personnel record and that Qwest gave him no training regarding excavation in the vicinity of underground utilities.

Charles Nelson, CK's cofounder, testifying about the third cut, stated that he had drilled the initial bore with a four or four-and-one-half inch drill bit, which came close to AT&T's cable during the boring. The next day, when a ten-to-twelve-inch back-reamer bore was used to widen the hole, CK cut AT&T's cable.[8] Nelson stated that the bore "ended up where I didn't think it was supposed to be." Nelson agreed that while he used the bore, the drill drifted under AT&T's cable, resulting in the cut; however, during this process, the DigiTrak locator indicated that the bore was eleven feet from AT&T's cable. Nelson stated that before the third cut, he had heard that there had been "interference" or problems with the DigiTrak locators. Moreover, Nelson testified that subsequent tests of the DigiTrak demonstrated that it was showing a deviation error of five feet. Nelson stated that he did not know how AT&T's cable was cut and that he did not intend for the bore to move toward AT&T's cable. However, he testified that either "something was out of control" or he could have been turning it.

Dr. Samuel Ariaratnam testified that CK deviated from "good practice" and industry standards when the second and third cuts occurred. Specifically, he cited the failure to maintain a log of all the DigiTrak readings as the bore proceeded underground and the inadequate calibration of the DigiTrak. Ariaratnam testified that the drill would only deviate on its own if it hit something but that, if the calibration was correct and the operator had control of its movement, the bore should have traveled straight along its intended path. Reviewing Nelson's deposition, Ariaratnam opined

---

[8] Nelson testified that another employee operated the drill, while he located and supervised.

that Nelson's statement, in which he said that a driller should just work through any interference affecting the DigiTrak, demonstrated a lack of care akin to gambling, because loss of the signal from the bore could result in deviation from the intended path. Ariaratnam expressed the opinion that Nelson knew that he had bored close to AT&T's cable and that he should not have taken the chance at using the back-reamer bore to widen the hole. When asked if CK and Nelson committed "legal malice," Ariaratnam stated that Nelson did not intentionally cut AT&T's line, but he acted with recklessness when he operated the twelve-inch bore after initially drilling so close to AT&T's cable.

Based on a thorough review of *all* the evidence (1) in the light most favorable to the finding and (2) in light of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Qwest and CK acted with malice. We hold that the evidence is both legally and factually sufficient to support both elements of *Ellender*. *See* 968 S.W.2d at 921. We overrule Qwest's first issue.

## II. The Agreement and Breach-of-Contract Damages

### A. The Agreement

By its second issue, Qwest asserts that the Agreement is not a valid rule 11 agreement. *See* Tex. R. Civ. P. 11. The district court submitted the issue of the Agreement's breach to the jury, who found that Qwest had breached the Agreement. Qwest argues that the court had no authority to enforce the Agreement over Qwest's objection and that the award of contract damages was error. Additionally, Qwest contends that the Agreement lacked "material" terms. AT&T rejoins that judgment on the Agreement was rendered in open court when the Agreement was dictated into the record and that attorney's fees are recoverable for Qwest's breach.

14

Rule 11 provides in its entirety:

> Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, *or unless it be made in open court and entered of record*.

*Id*. (emphasis added). The rule provides threshold requirements that apply to all settlement agreements. *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995) (citing *Kennedy v. Hyde*, 682 S.W.2d 525, 528 (Tex. 1984) ("Rule 11 is a minimum requirement for enforcement of all agreements concerning pending suits, including, but not limited to, agreed judgments.")); *Roeglin v. Daves*, 83 S.W.3d 326, 330 (Tex. App.—Austin 2002, pet. denied). "[C]ompliance with Rule 11 is a general prerequisite for any judgment enforcing an agreement touching a pending suit." *Kennedy*, 682 S.W.2d at 529. As a general rule, "[j]udgment is rendered when the trial court officially announces its decision in open court or by written memorandum filed with the clerk." *Reppert v. Beasley*, 943 S.W.2d 172, 174 (Tex. App.—San Antonio 1997, no writ) (citing *S & A Rest Corp. v. Leal*, 892 S.W.2d 855, 857 n.1 (Tex. 1995)). "The words used by the trial court must clearly indicate the intent to render judgment at the time the words are expressed." *S & A Rest.*, 892 S.W.2d at 858. Consent also must exist at the time the court undertakes to make the agreement the judgment of the court. *Id.* (citing *Quintero v. Jim Walter Homes, Inc.*, 654 S.W.2d 442, 444 (Tex. 1983)). A party has the right to revoke consent to an agreement at any time before, but not after rendition of judgment. *Quintero*, 654 S.W.2d at 444; *Arriaga v. Cavazos*, 880 S.W.2d 830, 833 (Tex. App.—San Antonio 1994, no writ). When a trial court has knowledge that one of the parties to a suit does not consent to a judgment, the trial court should refuse to sanction the agreement as the judgment of the court.

15

*Quintero*, 654 S.W.2d at 444. The court rendering an agreed judgment must do so "in strict or literal compliance with that agreement." *Vickrey v. American Youth Camps, Inc*., 532 S.W.2d 292, 292 (Tex. 1976).

At a December 1997 hearing scheduled for the purpose of hearing AT&T's request for a temporary injunction against Qwest, precipitated by Qwest's cutting AT&T's cable, the parties announced in open court that they had resolved the immediate dispute, and AT&T dictated the Agreement into the district-court record. When the court questioned Qwest about additions or deletions before AT&T's recitation, Qwest responded: "I hope to just say, agreed, Your Honor." AT&T then read the Agreement into the record, and Qwest offered one addition:

> And that the agreement does not act to release us from any liability that we had to them—that the defendants had to the plaintiffs before today's date. It doesn't constitute an admission of our liability and it does not act as a release of any liability the plaintiffs have to the defendant for any damage they have done to our property.

AT&T responded: "That's correct, Your Honor." Qwest, responding to the court's question concerning its authority to enforce the agreement for operations conducted out of state, stated that "it is contemplated that this agreement will actually be reduced to a contract between these parties to resolve any problems we had in Texas." The court then asked when performance was required.

The Court: How is it that you know that you're within 30 feet of an AT&T optic cable.

AT&T: Because what happens when they—before they start to dig any time they think they might be, they call us and we go out there and we tell them exactly where the cable is.

16

The Court: Okay.

Qwest: I believe the agreement provides, Your Honor, and correct me if I'm wrong, Mr. Schwartz [AT&T's attorney], it is within X number of feet of where they have marked their cable, Your Honor.

. . . .

Qwest: What the agreement contemplates, Your Honor, is we won't do any of this within X feet of where they have marked on the ground.

AT&T: Well, and I think the agreement says this, but there are some locations where they are going under rivers and under highways where you're not out there painting.

The Court: Low percentage activity.

AT&T: Even AT&T hasn't figured that one out yet.

The Court: Okay. With respect to the plaintiff's application for temporary injunction, judgment is rendered. [AT&T], you'll do the order. Pass it by [Qwest] and discussion for forum [sic] and then you all will submit it to me.

The hearing concluded at this point. Qwest did not object to anything that occurred at the hearing, before, during, or after AT&T's reading of the Agreement. Only after AT&T reduced the recitation to a proposed written order for submission to the district court did Qwest object and refuse to approve the written proposal.

AT&T later filed a motion for contempt and sanctions, accusing Qwest of violating the Agreement. Following a hearing, the district court determined that there was no withdrawal of consent, no ambiguity, no mistake, no lack of an essential term, and that there was, in fact, an agreement. The district court signed an "Agreed Order," which memorialized the language of the

17

Agreement previously announced in open court.[9] The following month, the court overruled Qwest's motion to strike and motion to determine that no rule 11 agreement existed. Qwest argues that it did not consent and that it objected to the "Agreed Order" signed February 17, 1998.

Approval of a settlement may not constitute rendition of an order enforcing that settlement. *Cf. S & A Rest.*, 892 S.W.2d at 857 (approval of settlement does not necessarily constitute rendition of judgment). But the facts before this Court differ from those of *S & A Restaurant*. There, the parties announced a settlement in open court, which the trial court accepted. *Id*. The court then explained to the plaintiff that once the court signed a judgment "everything else, it's full, final and complete." *Id*. at 858. The supreme court stated that for an agreement to constitute an agreed judgment, "[t]he words used by the trial court must clearly indicate the intent to render judgment at the time the words are expressed," and held that there was no agreed judgment rendered at the time the court accepted the settlement. *Id*. Here, the district court heard the settlement agreement as it was read into the record, announced "judgment is rendered," and instructed counsel to prepare an appropriate written order. There can be no doubt that the court intended at that time to dispose of the issues before him in the manner announced by the parties. Moreover, the parties sought the ruling. *See Burnaman v. Heaton*, 240 S.W.2d 288, 291 (Tex. 1951) ("[c]onsent must exist at the very moment the court undertakes to make the agreement the judgment

---

[9] The "Agreed Order" states that AT&T and Qwest had previously appeared and Qwest "announced that [Qwest] had reached an agreement with [AT&T] and requested that the Court enter the following agreement, which shall be enforceable by the contempt powers of this Court or any other court of competent jurisdiction." The order was drafted by counsel for AT&T and signed by the district court over the objection of Qwest. Regardless of whether there was a rule 11 agreement, the *order* was not "agreed."

18

of the court"). We will apply the same standard applicable to agreed judgments to agreed interlocutory orders and hold that Qwest's attempt to withdraw consent came too late.

We now turn to Qwest's contention that the Agreement failed for lack of material terms. Rule 11 requires that an agreement be: (1) in writing and filed in court or (2) that the terms of the agreement be announced in open court and entered of record. *Ebner v. First State Bank*, 27 S.W.3d 287, 295 (Tex. App.—Austin 2000, pet. denied). "These two provisions allow the agreement[] to be put into written form and kept with the court's records so that the parties to the suit cannot dispute its existence or contents." *Id.* (citing *Kosowska v. Kahn*, 929 S.W.2d 505, 507 (Tex. App.—San Antonio 1996, writ denied)). "There should be nothing left for adjustment between the parties relating to the subjectmatter [sic] of the agreement. Until all the terms of a final judgment have been definitely agreed upon by all parties . . . the court [is] without power to render a judgment by agreement." *Matthews v. Looney*, 123 S.W.2d 871, 873 (1939) (citing *Wyss v. Bookman*, 235 S.W. 567 (Tex. Com. App. 1921) (one essential feature required by party was omitted)). Whether a rule 11 agreement fails for lack of an essential term is a question of law. *DaimlerChrysler Corp. v. Brannon,* 67 S.W.3d 294, 298 (Tex. App.—Texarkana 2001, no pet.) (citing *Ronin v. Lerner*, 7 S.W.3d 883, 888 (Tex. App.—Houston [1st Dist.] 1999, no pet.)).

The reason for the essential-term requirement is expressed in *McLendon v. McLendon*: "the law . . . only requires the parties to reach an agreement as to all material terms of the agreement [to] prevent[] the trial court from supplying additional terms to which the parties have not agreed." 847 S.W.2d 601, 606 (Tex. App.—Dallas 1992, writ denied). The *McLendon* court held that specific provisions in underlying documents regarding a partnership being used as a

19

security interest for obligations in division of property did not affect the substantive division of the marital property. *Id.* In *Ronin*, the court opined that the law of contracts applies to rule 11 agreements. 7 S.W.3d at 886 (citing *Padilla*, 907 S.W.2d at 460 (writings embodying rule 11 agreement analogized to those required by statute of frauds)). The court held that apportionment of liability for indemnification was not an essential term "because the record reflect[ed] the essential terms with sufficient detail to determine the obligations of the parties." *Id.* at 888.

Other case law speaks to when missing provisions are material and leave the trial court without power to render the judgment. In *Reppert,* the court held that an agreement lacked the essential element as to whether the judgment would be self-enforcing through the trial court's contempt power or breach of contract. *Reppert*, 943 S.W.2d at 174. In *Rogers v. Rogers*, the court of appeals held that an agreement dictated into the record concerning the division of property similarly failed for lack of a material term. 806 S.W.2d 886, 888 (Tex. App.—Corpus Christi 1991, no writ). The agreement in *Rogers* did not include the manner in which 240 payments of $3500 per month would be secured. *Id.* The court held this term crucial because of the extended time frame and risk involved, noting that an earlier opinion stated "the trial court has no power to supply terms, provisions or conditions not previously agreed to by the parties." *Id.* (quoting *Leal v. Cortez*, 569 S.W.2d 536, 538 (Tex. Civ. App.—Corpus Christi 1978, no writ)).

Here, Qwest argues that after the district court's rendition, the parties were ordered to reduce the Agreement to a written order, which never occurred. Qwest urges that the Agreement dictated in open court lacked some material terms, which should have been reflected in the written order. Qwest posits that these material terms include several distance requirements, which some

20

portions of the Agreement contain but others lack. AT&T responds that some provisions do not have distance requirements, but that they are not required, and nothing on the face of the Agreement indicates that it is incomplete. AT&T contends that Qwest is simply attempting to avoid its Agreement.

The Agreement delineates the circumstances in which Qwest was to inform AT&T of its cable-installation operations and the precautions that Qwest was to take. These provisions explain the circumstances in detail, including distances, stating when Qwest was to notify AT&T of excavation operations.[10] The parties agreed to closely cooperate on future operations. The Agreement requires Qwest to monitor its operations with electronic devices and qualified personnel. It also provides for the sanction of contempt if Qwest fails to abide by the Agreement. The absence of some distance requirements, when the Agreement contains others, is not indicative of missing essential or material terms. *See Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex. 1972) (parties may agree on some terms sufficient to create contract, leaving other provisions for later negotiation). Any missing distance requirements are not material and could, therefore, be left open

---

[10] The Agreement (A) requires notice to AT&T if Qwest excavated within thirty feet of AT&T's cables; (B) states that Qwest would not engage in boring operations in the absence of continuous electronic location of the borehead during boring and pull-back operations, distance was not specified; (C) states a thirty-foot requirement for boring and digging test pits or holes to verify the location of the borehead; (D) requires the use of DigiTrak monitoring equipment, stating no distance requirement; (E) requires proper calibration of the DigiTrak; (F) requires Qwest to submit to AT&T any plans and the details of the operations if excavating within thirty feet of an AT&T cable; (G) requires AT&T approval for Qwest operations within two lateral feet and three vertical feet of an AT&T cable; and (H) specifies certain procedures when Qwest was boring within five feet of an AT&T "underground facility."

21

for future negotiation without destroying the contract's effectiveness. We overrule Qwest's second issue.

## B. Breach-of-Contract Damages

By its third issue, Qwest challenges the damages awarded AT&T for Qwest's breach of the Agreement. The jury was asked: (1) whether Qwest had breached the Agreement and (2) the "costs and expenses incurred by AT&T that were the natural, probable, and foreseeable consequence of Qwest's breach of the Rule 11 Agreement." The jury found that Qwest breached the Agreement and awarded AT&T damages of $317,824.16. The record indicates that AT&T requested $300,000 in attorney's fees for the breach-of-contract claim and $17,824.16 in travel expenses AT&T incurred in attempting to monitor Qwest's activities across the country. Qwest argues that: (1) "Texas law does not permit recovery of attorney's fees as 'damages'" and (2) "attorney's fees do not meet the definition in the damage question." AT&T asserts that $150,000 in attorney's fees was incurred between January and March 1998, when the district court gave final approval to the "Agreed Order." The remaining $150,000 was incurred in defending Qwest's interlocutory appeal to this Court and the supreme court. Qwest rejoins that the attorney's fees proved were not a consequence of any breach but were incurred as the result of AT&T's response to Qwest's challenge to the validity of the Agreement and "Agreed Order." Qwest asserts that "no actual damages were presented or proven" by AT&T.

As a general rule, attorney's fees are not recoverable from an opposing party unless such recovery is provided for by statute or by contract between the parties. *Trinity Indus., Inc. v. Ashland, Inc.*, 53 S.W.3d 852, 869 (Tex. App.—Austin 2001, pet. denied). This general rule is not

without exception. In some circumstances, damages measured by a plaintiff's attorney's fees are recoverable. *See, e.g.*, *McCall v. Tana Oil & Gas Corp.*, 82 S.W.3d 337, 344 (Tex. App.—Austin 2001), *rev'd on other grounds*, 46 Tex. Sup. J. 452, 2003 Tex. LEXIS 11 (citing *Findley v. Mitchell*, 50 Tex. 143, 147-48 (1878)) (recovery of attorney's fees as damages permitted where constable wrongfully denied plaintiff's right to replevy seized property). Additionally, equitable considerations have led to several narrow exceptions allowing attorney's fees to be recovered as damages even though not authorized by contract or statute. *See Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 798-800 (Tex. 1974) (discussing "common fund" doctrine and "fee shifting"). In *McCall*, this Court discussed two such exceptions. *See* 82 S.W.3d at 344-45. The first exception applies "where the defendant's tort requires the plaintiff to act in the protection of his interests by bringing or defending an action against a third party, the plaintiff 'is entitled to recover compensation for the reasonably necessary loss of time, attorney fees and other expenditures thereby suffered or incurred.'" *Id*. at 344 (citing *Restatement (Second) of Torts* § 914(2) (1977)); *see also Baja Energy, Inc. v. Ball*, 669 S.W.2d 836, 838-39 (Tex. App.—Eastland 1984, no writ). The second exception permits recovery of damages measured by attorney's fees when the defendant "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 345 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)). However, these exceptions are inapplicable to the matter now before us.

AT&T argues that the attorney's fees are "properly recoverable as consequential damages" and that recovery should be permitted based on equitable principles. AT&T relies on *Nationwide Mutual Insurance Co. v. Holmes*, where the court held that attorney's fees were

23

"recoverable as reasonable expenses when such expenses are the natural and proximate consequences of another's wrongful act." 842 S.W.2d 335, 341 (Tex. App.—San Antonio 1992, writ denied) (citing *Baja Energy*, 669 S.W.2d at 838). Holmes was sued for injuries resulting from a car accident, and when his insurance carrier Nationwide indicated that it would not settle the claim, upon Nationwide's advice, Holmes hired an attorney to protect his interests. *Id.* at 337. The suit against Holmes went to trial and Nationwide provided representation; however, Nationwide, knowing that Holmes was obligated to pay his retained attorney $7500 upon commencement of trial, failed to notify Holmes that it would indemnify him for any judgment in excess of the policy limits. *Id*. at 337-38. Holmes sued Nationwide for violation of the DTPA and received a favorable judgment, including recovery of the attorney's fees. *Id*. at 338. The court noted that Holmes did not incur the attorney's fees in defending himself in the original suit, but rather incurred the expenses because of Nationwide's wrongful conduct. *Id*.

*Nationwide Mutual Insurance* is distinguishable because AT&T is not recovering damages under the DTPA, and Qwest did not act wrongfully in exercising its right to appeal the "Agreed Order." Although AT&T now argues that Qwest's interlocutory appeal was filed to effect a delay, AT&T did not assert this allegation nor did it request sanctions before this Court. Moreover, we find no evidence of bad faith by Qwest in pursuing the appeals. *See General Elec. Credit Corp. v. Midland Cent. Appraisal Dist*., 826 S.W.2d 124, 125 (Tex. 1991) (sanctions not appropriate where appellant's argument on appeal fails to convince court but has reasonable basis in law and constitutes informed, good-faith challenge to trial court's judgment).

24

Under these circumstances, we hold that AT&T's attorney's fees were not recoverable as consequential damages. In addition, we hold that the $17,824.16 in travel expenses incurred by AT&T in monitoring Qwest's activities in other parts of the country were not occasioned by any alleged breach of the Agreement. AT&T presented no other evidence of breach-of-contract damages. We hold that AT&T failed to present legally sufficient evidence of these two elements of damage and sustain Qwest's third issue.

## III. Qwest's Liability for the Independent Subcontractors

By its fourth issue, Qwest argues that it is not liable for the negligence of the independent subcontractors. The district court submitted four questions to the jury concerning whether C&S was under Qwest's control and whether CK was under C&S's control at the time of the second and third cuts. As to the second cut, Question 9 asked the jury whether C&S was "conducting operations for the benefit of Qwest and subject to the control by Qwest as to the detail of the work." Question 10 asked whether CK was "conducting operations for the benefit of C&S Boring and subject to control by C&S Boring as to the details of its work." Questions 15 and 16 asked similar questions as to Qwest's control over C&S regarding the third cut. The jury answered all four questions affirmatively, and the district court found Qwest jointly and severally liable with C&S and CK for the second and third cuts. In its attempt to avoid liability for what Qwest argues are independent contractors, Qwest offers two arguments: (1) because AT&T did not request a question as to whether Qwest controlled the details of CK's work and Questions 9, 10, 15, and 16 did not submit a *respondeat superior* theory as to CK, AT&T waived the theory as between Qwest and CK, and (2) the evidence as to both contractors' lack of independence is legally and factually

insufficient. AT&T responds that, based on the jury findings and the evidence, Qwest is vicariously liable for C&S's and CK's actions in cutting AT&T's cable.

Generally, an employer or owner is not liable for the acts of its independent contractors. *See Abalos v. Oil Dev. Co.*, 544 S.W.2d 627, 631 (Tex. 1976); *Scott Fetzer Co. v. Read*, 945 S.W.2d 854, 859 (Tex. App.—Austin 1997), *aff'd,* 990 S.W.2d 732 (Tex. 1998); *see also Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). For a general contractor to be liable for its independent contractor's acts, it must have the right to control the means, methods, or details of the independent contractor's work. *Lee Lewis Const.*, 70 S.W.3d at 783; *Elliot-Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999); *Redinger v. Living, Inc*., 689 S.W.2d 415, 418 (Tex. 1985) (contractor responsible for physical harm caused by independent contractor if contractor retained control of work). The control must relate to the injury the negligence causes, and the contract must grant the contractor at least the power to direct the order in which work is to be done. *Elliot-Williams*, 9 S.W.3d at 804.

In *Cage Brothers v. Friedman*, Friedman sued Cage Brothers for trespass and damages to his property. 312 S.W.2d 532, 533 (Tex. Civ. App.—San Antonio 1958, writ ref'd n.r.e.). Cage Brothers had contracted with the State as general contractor to maintain a segment of highway. *Id.* Workers mistakenly destroyed a fence and cut trees on Friedman's property. Friedman sued, and Cage Brothers claimed the workers were employed by an independent subcontractor and, therefore, Cage Brothers was not responsible. *Id.* at 534. In holding Cage Brothers liable, the court reviewed the evidence indicating Cage Brothers' level of control over the workers. *Id.* The court observed that: (1) the State required contractors to seek approval of any subcontractors, which Cage Brothers failed to do; (2) all the employees were on Cage Brothers' payroll, tax, social security, and

26

workman's compensation lists; (3) all were paid by Cage Brothers; (4) the person who signed the employees' checks was a partner of the subcontractor company; and (5) this partner and another partner of the subcontractor directed the employees on the job and were paid salaries by Cage Brothers. *Id.* The court concluded its review of the evidence by observing that: "[W]e think there is more than slight testimony, and that the evidence is sufficient to meet the test of master and servant relationship." *Id.*

Qwest argues that the evidence to support the requisite level of control is neither legally nor factually sufficient. After reviewing the evidence, we disagree. Although the contract between C&S and CK indicates the existence of a contractor and independent subcontractor relationship, such fact is not dispositive. *See Farrell v. Greater Houston Transp. Co.*, 908 S.W.2d 1, 3 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (where contract does not grant control over work details to principal, evidence outside contract must show true operating agreement vested right of control in principal). Evidence at trial revealed that C&S contractually retained some control over CK's work, but CK personnel, and Nelson in particular, also exercised some oversight with regard to C&S's operations. Nelson, who had previously been employed with C&S, admitted to "guiding and helping" C&S construction crews, and he signed C&S drawings as the "foreman." C&S retained the right to control CK's employee-hiring decisions in the contract. Additionally, the evidence showed that CK and C&S shared equipment, as evidenced by the testimony of Nelson and C&S's president. As is germane to the events giving rise to this action, there is no practical difference between C&S and CK.

The contract between Qwest and C&S demonstrates Qwest's right to control C&S. The contract states that C&S was to follow Qwest's plans and that Qwest would review and advise

27

C&S as to the work performed and its acceptability. Qwest also had the right to require C&S to hire more workers, increase overtime operations, or require additional days of work. Further, C&S agreed not to subcontract any of the work without Qwest's approval and to guarantee any subcontractor's work. Moreover, the contract stated that C&S would be "responsible for the proper and safe performance of the work." Qwest also retained the right to terminate any C&S employee it found objectionable. Qwest routinely had an inspector on site, including when the second and third cuts occurred. Nelson testified that Junior Drake "was a Qwest guy" who was in charge of CK's excavations in November. Nelson testified that after finishing two bores, Drake "come down and asked me would I consider to make a longer bore . . . ," instead of the two bores that Nelson had drilled. In response to the request, Nelson stated: "And I told him, yes, I would try."

Qwest offered contrary evidence as to its control of C&S and CK. Regarding the testimony of Nelson, Qwest points out that Nelson stated that the Qwest employee "asked," not "directed," him to redo an excavation. Nelson also testified that no C&S personnel directed his operations at any time relevant to the second and third cuts. Qwest argues that its contracts with C&S and C&S's contract with CK clearly state that the relationship is that of an independent contractor. However, we conclude that there is legally and factually sufficient evidence to support the jury's finding to the contrary.

Qwest's argument that AT&T was required to submit a jury question concerning Qwest's control of CK is likewise without merit. Where issues that constitute only a part of a complete and independent ground are omitted and other issues necessarily referable to that ground are submitted and answered, the omitted elements are deemed found in support of the judgment if no objection to the omission is made, and the answers are supported by some evidence. Tex. R. Civ.

28

P. 279; *Ramos v. Frito-Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990) (omitted element of managerial capacity supported by some evidence deemed found). Although it was AT&T's burden to obtain an affirmative finding as to Qwest's control over CK, it was Qwest's responsibility to object to the omission. *See* Tex. R. Civ. P. 279. Qwest did not object, and the omitted issue constituted only a part of a complete and independent ground of recovery—Qwest's responsibility for the work of the independent contractors, and other evidence adduced at trial supports the finding.

Qwest hired C&S as a subcontractor. From the evidence, the jury could have determined that Qwest controlled C&S. Similarly, from the evidence the jury could have determined C&S controlled CK. Moreover, there is some evidence that Qwest exercised control over CK. Qwest did not object to AT&T's failure to request a jury question as to whether Qwest controlled the actions of CK. *Id.*; *Ramos*, 784 S.W.2d at 668. We overrule Qwest's fourth issue.

## IV. Exemplary Damages and Prejudgment Interest

The district court calculated exemplary damages as follows: (1) damages resulting from the first cut were included; (2) prejudgment interest, breach-of-contract damages, and damages resulting from the second cut were not considered; and (3) twenty percent of the damages resulting from the third cut were considered. Applying the statutory cap, the district court reduced the jury's exemplary-damages award to two times the economic damages, or $467,808.91.[11]

---

[11] The district court, based on the jury's finding, awarded AT&T $51,000 in exemplary damages against C&S for its role in the third cut and rendered judgment for that amount. Because the amount of exemplary damages against C&S was less than the economic damages found against C&S, the district court was not required to apply section 41.008(b). *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West Supp. 2003). No party appeals this portion of the judgment.

## A.  The Exemplary-Damages Cap

By its first issue on appeal, AT&T argues that the district court improperly limited exemplary damages.  The district court based the calculation of exemplary damages only on Qwest's actions associated with the findings of *malice*:  the first cut and twenty percent of the third cut. AT&T contends that the district court should have used the following formula to calculate damages: "add[] prejudgment interest to the $1 million in actual damages that the jury found AT&T had suffered, and then double[] the sum to arrive at the proper amount of exemplary damages to be awarded against Qwest."  Qwest responds, arguing that exemplary damages are not warranted, that joint and several liability is not available for exemplary damages, and that it should not be held responsible for the actions of C&S and CK.  Alternatively, Qwest urges that if exemplary damages are proper, then the district court's calculation should be upheld.  We will affirm the district court's application of the statutory exemplary-damages cap and the award of its exemplary damages.

The dispute over the calculation of the exemplary damages turns on chapter 41 of the civil-practices-and-remedies code.  *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001-.013 (West 1997 & Supp. 2003).  Statutory construction is a question of law, *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989), the resolution of which must begin by looking to the statute's words, *Liberty Mutual Insurance Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998). "The goal of statutory construction is to give effect to the intent of the legislature."  *Monsanto Co. v. Cornerstones Mun. Util. Dist.*, 865 S.W.2d 937, 939 (Tex. 1993) (citing *Harris County Dist. Attorney's Office v. J.T.S.*, 807 S.W.2d 572, 574 (Tex. 1991)).  Simply stated, where a statute is unambiguous, we discern the legislature's intent from the "plain and common meaning of the words

30

and terms used." *Id.* (citing *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 352 (Tex. 1990); *RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex. 1985)).

As applied here, chapter 41 limits an award of exemplary damages to two times the amount of economic damages. Tex. Civ. Prac. & Rem. Code Ann. § 41.008(1)(A) (West Supp. 2003). Exemplary damages are "any damages awarded as a penalty or by way of punishment." *Id.* § 41.001(5). Economic damages are "compensatory damages for pecuniary loss; the term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship and society." *Id.* § 41.001(4). "[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from . . . malice." *Id.* § 41.003(a) (West 1997); *see also id.* § 41.004(b) (West 1997). Finally, "[p]rejudgment interest may not be assessed or recovered on an award of exemplary damages." *Id.* § 41.007 (West 1997).

The two-times-economic-damages award should be applied only to the damages for the actions where the jury found malice. The jury found no malice in connection with the second cut. Likewise, AT&T did not request a jury question asking for a finding of malice as to Qwest's breach of the Agreement. We hold that the district court was correct in excluding such damages in calculating allowable exemplary damages.

AT&T's contention that all the damages are "economic damages" and should be included in the calculation contravenes the statutory purpose of exemplary damages, which is to punish. *See id.* § 41.001(5). If AT&T had brought a separate suit for each cut, resulting in the same jury findings as here, AT&T would not have been entitled to exemplary damages as to the second

31

cut, because the jury did not find malice as to that act. To make such an award now would be counterintuitive; the jury found no malice as to Qwest's actions regarding the second cut. The supreme court has opined that: "[o]ur duty in civil cases . . . like the duty of criminal court, is to ensure that defendants who deserve to be punished in fact receive an appropriate level of punishment, while at the same time preventing punishment that is excessive or otherwise erroneous." *Moriel*, 879 S.W.2d at 17. Here, to award AT&T exemplary damages for what is essentially a negligent act would impose an inappropriate level of punishment.

Nor should prejudgment interest be doubled in the damages-cap calculation. In *Ellis County State Bank v. Keever*, the supreme court held that an award of prejudgment interest on exemplary damages was improper. 888 S.W.2d 790, 798 (Tex. 1994) (citing Act of June 3, 1978, 70th Leg., 1st C.S., ch. 2, § 2.12, 1978 Tex. Gen. Laws 37, 46 (amended 1995) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 41.007)). The court opined that "[p]unitive damages, being inherently penal in character, should not be enlarged by the imposition of prejudgment interest in the absence of an express legislative intent to do so." *Id.* Although AT&T advocates that it is not seeking prejudgment interest on the exemplary damages, but, rather, the inclusion of prejudgment interest as an "economic damage," its argument was rejected in *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.* 979 S.W.2d 730 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (noting that result of this argument was mathematically same where jury's award greatly exceeds cap).[12] Adding

_____

[12] In *St. Paul Surplus Lines v. Dal-Worth Tank Co.*, the supreme court held that under the DTPA, prejudgment interest should not be added to the "actual damages" and then trebled, reasoning that "trebling the sum of damages ["D"] and interest ["I"] is equal to the sum of treble damages and treble interest: in other words, $3(D + I) = 3D + 3I$." 974 S.W.2d 51, 54 (Tex. 1998). Here, AT&T's argument, reduced to an algebraic formula, would be $2(D + I) = 2D + 2I$.

prejudgment interest to the award of economic damages and then doubling the sum would be no different than adding two times the economic damages and two times the prejudgment interest to compute the final award. We overrule AT&T's first issue.

## B. Prejudgment Interest

By its second issue, AT&T disputes the district court's calculation of prejudgment interest. CK, by its only issue on appeal, also argues that the district court erred in calculating the prejudgment interest. On November 12, 1997, AT&T filed suit only against Qwest and C&S. On January 23, 1998, C&S sued CK as a third-party defendant. On May 5, 2000, AT&T amended its petition, naming CK and Nelson as additional defendants. After the verdict, the district court determined that prejudgment interest began to accrue against CK on the date AT&T amended its petition to include CK as a defendant, May 5, 2000, and that CK's two settlement offers, which AT&T rejected, did not toll the accrual of prejudgment interest as to CK's portion of the damages.

### 1. Date of Accrual Against CK

AT&T argues that the prejudgment interest should have begun to accrue from December 12, 1997, the date the original suit was filed. Alternatively, AT&T contends that accrual should begin on January 23, 1998—the date CK first had notice of AT&T's claims by virtue of C&S's suit against CK—or 180 days after this date, because CK "could have, but chose not to settle those claims." *See* Tex. Fin. Code Ann. § 304.104 (West Supp. 2003). CK responds that the district court properly held that prejudgment interest ran from May 5, 2000, the date AT&T amended its petition naming CK and Nelson. The Texas Finance Code provides:

33

Except as provided by Section 304.105 or 304.108, prejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered. Prejudgment interest is computed as simple interest and does not compound.

*Id*.

In *Robinson v. Brice*, this Court, construing a predecessor of section 304.104, held that the defendant must receive written notice of a "claim."[13]   894 S.W.2d 525, 528 (Tex. App.—Austin 1995, writ denied). *Robinson* involved a one-car accident in which the injured passenger sued the driver, who was driving his employer's car. *Id.* at 527. The plaintiff argued that prejudgment interest began to run 180 days after the corporation's insurance company received a copy of the accident report from the corporation, or, in the alternative, 180 days from the plaintiff's request for additional payments. *Id.* at 528-29. Because the finance code did not define the term "claim," we determined that the term's ordinary meaning was: "a demand for compensation or an assertion of a right to be paid." *Id.* As a result, we held that notification of the accident and an injury were not enough; however, we further held that the request for additional payments directed to the insurance company was sufficient notice of a claim. *Id.* We construed the statute liberally to achieve its purposes of fully compensating plaintiffs and encouraging settlements. *Id.* at 529 (citing Tex. Gov't Code Ann. § 312.006(a) (West 1998)).

---

[13] Texas Revised Civil Statute article 5069-1.05 § 6(a) preceded section 304.104, Texas Finance Code; however, the applicable language is identical. *Compare* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, §1, 1987 Tex. Gen. Laws 51, 51, *with* Tex. Fin. Code Ann. § 304.104 (West 2003).

In *Lee v. Fenwick*, the court, interpreting the same civil statute, held that sending notice to an attorney not of record for the defendants does not provide notice to the defendants. 907 S.W.2d 88, 89 (Tex. App.—Eastland 1995, writ denied). The applicable statutory language was "written notice of a claim" to the "defendant." *Id.* (quoting Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, §1, 1987 Tex. Gen. Laws 51, 51 (amended 1995) (current version at Tex. Fin. Code Ann. § 304.104)). In *Lee*, the plaintiff's attorney sent notice to an attorney whom he believed represented the two defendants; however, a different attorney appeared of record. *Id.* at 89-90. The record did not reflect any authority on the part of the attorney. *Id.* at 90. The court held that there was no proof that the attorney who received notice was an attorney for both defendants, the attorney did not appear of record for the defendants, and there was no proof that the defendants received the written notice; therefore, the prejudgment interest ran from the date suit was filed and not from the date of the notice sent to the misidentified attorney. *Id.*

Finally, in *Thrift v. Hubbard*, the court held that "suit was filed" when plaintiffs amended their petition to include a claim for intentional infliction of emotional distress. 44 F.3d 348, 362 (5th Cir. 1995) (interpreting Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, §1, 1987 Tex. Gen. Laws 51, 51 (amended 1995)). Thus, plaintiffs would be allowed to recover prejudgment interest on their claim from the date of amendment and not from the date suit was first filed. *Id.* The *Thrift* court held the defendants had notice of the claim, and thus an opportunity to settle, when they received the amended petition, and that holding otherwise would defeat the statute's objective of encouraging settlements. *Id.* The court also ruled that the 180-day delay from the amendment to the accruing of prejudgment interest did not apply because the language "whichever is earlier" required

35

the accrual to begin on the earlier of the two dates—the date the plaintiffs amended their petition. *Id.*

Here, the purpose of encouraging settlements would not be served if prejudgment interest began to run from December 12, 1997, the date AT&T filed suit against Qwest and C&S, because CK had received no notice at that time that AT&T asserted a claim against it. On January 23, 1998, the date C&S sued CK, CK received notice and an opportunity to settle the claim with C&S; however, AT&T had yet to present notice to CK of a claim; as of this date CK was a named defendant only as to C&S. Nelson had not yet been named as a defendant. AT&T argues that because the district-court judgment found Qwest and C&S jointly and severally liable to AT&T for the damages caused by CK, prejudgment interest should begin to run against CK on December 12, 1997. AT&T posits that by virtue of this holding, it would have been entitled to the damages caused by CK from Qwest and C&S without suing CK and prejudgment interest would have run from December 12, 1997. Therefore, it should not be penalized for filing suit against CK, which would result from designating the May 5, 2000 date as the date that prejudgment interest began to run against CK. AT&T directs this Court to no authority in support of this proposition, and we have found none. The fact remains that AT&T made no claim against CK to which it could respond until AT&T actually named CK as a defendant. In the hypothetical scenario described by AT&T, CK would not be liable for prejudgment interest. Only Qwest and C&S would be liable. We hold that AT&T did not give the required notice of its claim to CK until May 5, 2000, when AT&T amended its petition to name CK as a defendant. Only then was CK required to consider whether it should settle with AT&T. We overrule AT&T's second issue.

36

## 2. Tolling

In its only issue, CK argues that the district court erred in failing to toll the accrual of prejudgment interest for the period after CK made its two settlement offers, until October 25, 2001, the date of entry of judgment.[14] CK posits that tolling should have began on September 21, 2000, when it made an offer to settle for $200,000, and on April 25, 2001, when CK made its second settlement offer for $439,684.93. In the alternative, CK urges that the settlement offers were open to acceptance until AT&T rejected them in writing. Although, CK admits that AT&T had promptly rejected both offers, it argues that the rejections were not in writing and AT&T had the burden of proving that the rejections were "immediate," rather than "prompt."

The purpose of prejudgment interest is twofold: "(1) encouraging settlements and (2) expediting both settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy*, 962 S.W.2d 507, 529 (Tex. 1998); *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 266 (Tex. App.—Austin 2002, no pet.). The finance code controls the effects of a settlement offer on the accrual of prejudgment interest. *See* Tex. Fin. Code Ann. § 304.105 (West Supp. 2003). Specifically, "[i]f judgment for a claimant is more than the amount of a settlement offer of the defendant, prejudgment interest does not accrue on the amount of the settlement offer during the period that the offer may be accepted." *Id.* § 304.105(b). Further, a settlement offer must be in writing to affect the accrual of prejudgment interest. *Id*. § 304.106. The supreme court, in *C & H Nationwide, Inc. v. Thompson*, opined that the purpose of prejudgment interest is to "encourage

---

[14] CK argues that the total amount of its damages to AT&T should be $439,803.34, a difference from the judgment of $32,393.30.

37

settlement." 903 S.W.2d 315, 325 (Tex. 1994) (citing Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 51, 52 (amended 1995) (current provision at Tex. Fin. Code Ann. § 304.105)). The court noted that the tolling provisions

> suspend accrual of prejudgment interest during the period in which a settlement offer *may be accepted*. This is not merely an effort to arrive at an accurate measure of compensation for the plaintiff's loss of use of money, since a plaintiff who *declines* a settlement offer has been without the use of the money just as surely as one who received no offer.

*Id.* (emphasis added). The supreme court's language contemplates the possibility of the rejection of a settlement offer.

In *Harris v. Mickel*, a defendant made a settlement offer for an amount greater than the final damage award, but the plaintiff rejected it four days later. 15 F.3d 428, 429 (5th Cir. 1994) (citing Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 51, 52 (amended 1995)). The court held that the defendant was entitled to have the prejudgment interest tolled for the four days, or from the time of the offer until the plaintiff's rejection. *Id.* at 430-31. The court opined that "once an offer is *rejected*, the general rule is that the offer is thereby terminated, and consequently it cannot be accepted." *Id.* at 431 (emphasis added).

Although an intention of the legislature in authorizing prejudgment interest was to foster settlements, there is no legal prohibition against rejecting an offer and no requirement that an offer cannot be rejected or that the rejection be in writing. *See Thompson*, 903 S.W.2d at 325. Only the settlement offer need be in writing; the statute makes no mention of the form a rejection must take. *See* Tex. Fin. Code Ann. §§ 304.105, .106. CK has directed this Court to no authority for its

assertions and, moreover, stipulated to AT&T's "prompt" rejections of the offers.[15] Furthermore, CK's argument that a settlement offer made after the jury verdict should toll the accrual of prejudgment interest is equally without merit. After the jury verdict, AT&T was entitled to the amount awarded, subject to the district court's approval. We overrule CK's issue.

---

[15] CK asked the district court to admit letters containing its two settlement offers into evidence. AT&T objected, unless CK stipulated to the fact that AT&T "promptly" rejected the offers. Before their admittance, CK asked for the court's ruling. The testimony proceeded as follows:

AT&T:    Well, subject to the–the stipulation that I mentioned.

CK:    That you rejected the one, and I assume that you're rejecting the second one? Because you haven't called me up and said you're not going to take it.

AT&T:    Well, I don't agree with that characterization of the facts and the—what I said was that assuming that we are agreeing that our responses to these settlement offers, so-called, are—were prompt and negative, then I'm okay with having these come into evidence. Subject—otherwise, we want to prove what happened, with evidence.

CK:    And that's fine. They did reject them, and that's fine.

The Court:    Okay.

AT&T:    Then, in that—and therefore, I have no objection to the letters coming in.

The Court:    They [the settlement-offer letters] are admitted then on the stipulation stated on the record, with respect–with regard to the response by AT&T.

39

## CONCLUSION

We reverse the district court's judgment in so far as it awards AT&T damages for its breach-of-contract action and render judgment that AT&T take nothing by such claim. In all other respects, we affirm the district-court judgment.

_____

Lee Yeakel, Justice

Before Justices B. A. Smith, Yeakel and Aboussie[*]

Affirmed in Part; Reversed and Rendered in Part

Filed: June 12, 2003

---

[*] Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).