COURT OF 
APPEALS
SECOND 
DISTRICT OF TEXAS
FORT 
WORTH
 
NO. 2-02-095-CV

 
CITIZENS 
NATIONAL BANK AND                                           APPELLANTS
LENDER 
ASSET RECOVERY, INC.,
AND 
DON LAWSON
 
V.
 
ALLEN 
RAE INVESTMENTS, INC.,                                             APPELLEES
RUTH 
NARRAMORE, RUTH ANN
TAYLOR, 
AND ERIKA TAYLOR
 
------------
 
FROM 
THE 271ST DISTRICT COURT OF WISE COUNTY
 
------------
 
OPINION ON REHEARING
 
------------
        After 
reviewing Appellant Don Lawson’s motion for rehearing, Appellee’ motion for 
rehearing, and Appellants Citizens National Bank’s and Lender Asset 
Recovery’s response to the motions for rehearing, we deny the motions.  
We withdraw our March 11, 2004 opinion and judgment and substitute the 
following.
        This 
appeal is from a lawsuit involving a loan Citizens National Bank (CNB) made to 
Allen Rae Investments, Inc. (ARI) and upon which ARI defaulted. Appellants CNB, 
Lender Asset Recovery, Inc. (LAR), and Don Lawson appeal from a judgment 
awarding approximately $1.2 million to Appellees ARI and its principals, Ruth 
Narramore, Ruth Ann Taylor, and Erika Taylor. We affirm the judgment against LAR. 
Regarding CNB and Lawson, we reverse and render in part, affirm in part, and 
remand the case to the trial court for recalculation of prejudgment interest and 
entry of judgment in accordance with this opinion.
I. 
Background Facts
        In 
1996, Ruth, her daughter Ruth Ann, and Ruth Ann’s daughter Erika formed ARI 
for the purposes of building, owning, and operating a Motel 6 in Decatur, Texas.[1]  Each woman owned one hundred shares of ARI’s stock 
and served as a company officer. ARI was authorized to issue one thousand shares 
of stock, but only three hundred were issued at this time.
        Appellees 
began negotiating a deal with Motel 6. A Motel 6 representative told Appellees 
that they could build a Motel 6 with a ten-percent down payment and a 
ninety-percent loan. Appellees purchased a Motel 6 franchise. Motel 6 
recommended that Appellees contact The Money Store, a Colorado lending 
institution, to seek financing for their project because that lender had 
provided loans on other Motel 6 projects. At the time Appellees purchased the 
franchise, a Motel 6 project cost $1.2 to $1.4 million. The Money Store 
prequalified Appellees for a $576,000 loan. Contrary to what the Motel 6 
representative had told Appellees, however, The Money Store required a 
twenty-percent down payment on a Motel 6 loan. Appellees learned that a 
twenty-percent down payment was a standard requirement for start-up companies in 
this type of venture. Although Appellees’ franchise agreement with Motel 6 
expired on August 30, 1997, Motel 6 was willing to move forward with the Decatur 
Motel 6 project if ARI began construction on the motel during 1998. By the end 
of 1997, the cost of a Motel 6 project had risen to $1.8 million. According to 
Ruth Ann, at that time ARI was willing and able to pay twenty percent down on a 
$1.8 million loan.
        In 
December 1997, in a further attempt to secure financing for a Motel 6 project, 
Ruth Ann contacted CNB. At that point, Appellees had never been formally 
rejected for a loan. Ruth Ann spoke by telephone with Don Lawson, a business 
development officer at CNB. She informed Lawson that ARI wanted to borrow money 
to build a Motel 6, forwarded a business proposal to him, and told him that ARI 
preferred a ninety-percent loan, but that it was open to other options because 
the principals wanted to build a Motel 6.
        Meanwhile, 
Boyd L. Stewart, national sales director for Bed & Bath Inns Inc. (Bed & 
Bath), met with Doug Sanders, executive vice president of CNB. Stewart wrote a 
follow-up letter to Sanders on January 2, 1998, expressing “thanks for the 
efforts and support coming from [Sanders] and Ray[mond Dickerson],” CNB’s 
president. The letter discussed a past joint meeting with A.J. Lambert about his 
land and a meeting with Larry Barnes, a client of CNB and potential franchisee 
of Bed & Bath. It also indicated Bed & Bath’s plan to have the second 
meeting with Barnes at the Gainesville, Texas Bed & Bath Inn, emphasizing 
that “[t]he Gainsville property shows well and always creates heightened 
interest on the part of the buyer.” Stewart stated in the letter that he 
“believ[ed] enough Bed & Bath Inn projects could be completed in the first 
six months of 1998” to “significantly impact the aggressive revenue goal 
[Sanders] and Ray ha[d] set for [CNB].” This letter was followed by a business 
presentation to more CNB employees on January 14, 1998. Lawson attended this 
presentation.
        On 
January 21, 1998, Ruth Ann met with Lawson for thirty minutes at CNB. Lawson 
told her that ARI could not finance a $1.8 million Motel 6 project with a down 
payment of only ten percent. He also claimed at trial that she told him that ARI 
did not want to put more than $140,000 down.
        Lawson 
testified that he thought the Bed & Bath presentation he had attended a week 
earlier was “hit or miss,” and he “didn’t buy into the Bed & Bath 
sales pitch.” Despite his misgivings, without divulging any information about 
his or CNB’s prior relationship with Bed & Bath, or any of his own doubts 
about Bed & Bath’s claims, Lawson informed Ruth Ann about Bed & Bath, 
a less expensive motel chain, gave her a copy of the Bed & Bath brochure he 
had received from Bed & Bath, and discussed it with her. He suggested that 
ARI consider the Bed & Bath project, telling Ruth Ann that a Bed & Bath 
motel would cost less and could be built faster than a Motel 6. Lawson also told 
Ruth Ann that CNB would extend a U.S. Small Business Administration (SBA) loan 
on the Bed & Bath project, but not on another project. When Lawson 
recommended Bed & Bath to Appellees, neither Lawson nor CNB had conducted 
any due diligence regarding the company, investigated whether the information in 
the brochure was correct, or determined the creditworthiness of Bed & Bath. 
At trial, Lawson ultimately admitted that based on its assets and those of its 
principals, ARI could have come up with enough money for a twenty-percent down 
payment for the Motel 6 project.
        A 
few weeks after receiving the Bed & Bath franchise information from Lawson, 
Appellees met with Doug Biter, a Bed & Bath representative. During 
their two-hour meeting, Appellees discussed the project with Biter and further 
reviewed Bed & Bath literature. At a later meeting with Biter, Appellees 
toured the Gainesville facility. Appellees had numerous telephone conversations 
with Bed & Bath representatives and received and reviewed additional 
literature from Bed & Bath.
        On 
February 20, 1998, ARI submitted a detailed investment proposal to CNB. On March 
4, 1998, CNB sent Appellees a letter indicating that it had “agreed to pursue 
approval for [the] loan request for the acquisition of real estate and 
construction of a Bed & Bath Inn in Decatur, Texas,” providing the terms 
for the loan, and requesting $3,500 in earnest money before assembling the loan 
package. Only after receiving this document did ARI purchase a Bed & Bath 
franchise for $25,000. CNB approved the $600,000 loan on March 17. The projected 
cost to complete the Bed & Bath project was $750,000.
        Although 
CNB approved the $600,000 loan in the middle of March, it did not close on it 
until September 23, 1998, five months later. During those five months, Lawson 
and CNB executive vice president Doug Sanders, the officer responsible for 
ARI’s loan, attempted to obtain required financial information from Bed & 
Bath. Because Bed & Bath would not cooperate, Lawson wrote a memorandum to 
Bed & Bath requesting year-end (1997) balance sheets, income statements, tax 
returns, and other financial documents. The memo read, in part:
 
We 
have sent several referrals to you for this project. We feel there are many more 
that we would send, but are starting to lose our enthusiasm by having to work so 
hard at getting initial information from you. This is considered an urgent 
problem to Doug and I. We could be on the verge of losing a deal we switched 
from Motel 6 to you because of the delay.

 
        Testimony 
showed that CNB never gave a copy of this memo, or otherwise shared the 
information contained in it, with Appellees. The memorandum itself does not 
reflect that ARI was a recipient of this memo or that it received a carbon copy 
of it. Appellees learned about the memo after discovery began in this lawsuit.
        On 
May 25, 1998, Bed & Bath still had not sent the requested financial 
information to CNB, and Lawson sent Bed & Bath another memo stating that CNB 
would not go forward on any other Bed & Bath project and would not recommend 
any other Bed & Bath projects until Bed & Bath performed on ARI’s 
project. Ultimately, the only financial statements CNB ever received from Bed 
& Bath were unaudited financial statements of Amerimation, Inc., the parent 
company of Bed & Bath, which showed that Amerimation earned only $68,000 in 
income in ten months of operation. At trial, Lawson stated that he did not ask 
for audited financial statements because they are expensive. However, the Bed 
& Bath brochure specifically identified Bed & Bath’s accounting firm 
and CPA. There is no indication that CNB or Lawson ever asked either the Bed 
& Bath personnel or their accountants whether audited statements were 
already available. Ruth Ann testified that had she known CNB was losing 
enthusiasm for the project and was not going to recommend anyone else to Bed 
& Bath, ARI would have pulled out of the deal.
        The 
parties executed numerous agreements in connection with the project. In July 
1998, two months before the closing, ARI entered into a franchise agreement and 
a motel construction agreement with Bed & Bath. The franchise agreement 
provides that ARI “conducted an independent investigation of the business.” 
The motel construction agreement provides, in pertinent part:
 
3.3Payment 
Schedule. Attached is a Schedule of Payments covering the various divisions of 
the Work to be done under this Agreement. This Schedule of Payments shall 
aggregate the total Contract Sum. Owner agrees to pay the amounts specified 
within 24 hours of such draw request as set forth in the Schedule of Payments. 
The Schedule of Payments may be amended by Contractor in the event of a Change 
Order agreed to by the parties, and/or in the event allowances are exceeded as 
provided for in the attached Plans and Specification.
 
The 
schedule provides that twenty-five percent ($162,500) of the contract sum 
($650,000) was due at the time the agreement was signed. The printed date of the 
contract was July 9, 1998.
        On 
September 21, 1998, ARI entered into a construction loan agreement with CNB, 
which Bed & Bath’s representative also signed. The agreement expressly 
provides that any action taken by CNB to inspect the project or review the plans 
was done for its own protection and not for the benefit of ARI. However, the 
agreement also provides that “[d]uring the term of the construction, the 
provisions of this Loan Agreement shall control in the event there are any 
conflicts with any provision of any instrument, document, or writing referenced 
herein.” The agreement additionally states that the funds will be advanced on 
a percentage-of-completion basis for “costs of labor performed and materials 
furnished.” The three ARI principals pledged their three hundred shares of ARI 
stock and other assets as collateral for the loan.
        Several 
days before the closing of ARI’s loan, and without ARI’s knowledge, CNB 
hired FAS Disbursement, L.L.C. (FAS), a construction management firm, to review 
the Bed & Bath project. CNB had an ongoing relationship with FAS. On 
September 17, 1998, one week prior to closing, FAS sent its pre-construction 
initial project review to CNB. The $1,000 fee for this review was paid out of 
ARI’s funds.
        In 
the review, FAS raised concerns about the Bed & Bath project, particularly 
about the $162,500 advance due before any work was performed on the project. FAS 
recommended that, to ensure the work was actually being performed, CNB pay Bed 
& Bath only as it completed the work. CNB did not send a copy of the report 
or disclose any of FAS’s concerns to Appellees. Sanders admitted that if CNB 
had made ARI aware of this information, ARI could have chosen not to close on 
the loan, no harm would have occurred, and all parties could have gone their 
separate ways.
        Four 
days before the loan closed, Appellees told CNB that they were not going to 
close the loan. CNB requested that Appellees come to the bank to discuss the 
matter. Although not invited by Appellees, a Bed & Bath representative 
appeared at the meeting. CNB executive vice president Doug Sanders, CNB vice 
president Linda Hestilow, and Don Lawson were also present at the meeting. 
During the meeting, the CNB officers told Appellees that there was no reason to 
be afraid of the project, that it was a good deal, and that ARI should go 
forward with it. The bankers convinced ARI to go forward with the project. There 
was no mention about FAS’s or CNB’s concerns about the $162,500 advance.
        The 
loan closed on September 23, 1998. CNB continued to conceal from ARI the stated 
concerns of FAS about Bed & Bath, and ARI did not learn of those concerns 
until after this suit was filed. Additionally, at all times leading up to the 
closing, CNB represented to ARI that a performance bond would be in place to 
protect ARI’s interests. A bond was obtained and in the file at the time of 
closing. During the closing, CNB for the first time told ARI that no performance 
bond was needed. Instead, CNB told ARI that CNB had hired FAS and assured ARI 
that FAS was just as good as a performance bond. CNB returned the performance 
bond to the issuer within thirty days of closing. ARI agreed in writing to allow 
FAS to act as CNB’s agent in making construction cost loan disbursements on 
the project. This is the only agreement between FAS and ARI. One specific 
provision outlining FAS’s obligations to ARI reads as follows:
 
Important: [FAS] is working solely for 
[CNB] as its administrative agent . . . . [FAS’s] sole obligations with 
respect to this project is to [CNB,] and [FAS] has no contractual obligation to 
[ARI], or to [ARI’s] contractor (or to their subcontractors/vendors/design 
professionals/consultants), or to any other third party. [FAS’s] review of the 
plans and specifications and of any project documentation for [CNB] shall not be 
construed as a representation by [FAS], or by [CNB], as to the content, 
completeness, quality, correctness, or sufficiency of such documents. [ARI] and 
its contractors are responsible for all independent architectural, engineering 
and other expert inspection and observation.

 
        The 
day after closing, FAS told CNB that Bed & Bath had still not adequately 
addressed FAS’s concerns about the $162,500 advance payment. CNB forwarded 
FAS’s letter to Bed & Bath. Ten days later, Bed & Bath sent a letter 
to Doug Sanders at CNB which stated, in part:
 
I 
strongly request your bank’s funding of our initial payment $162,500 
today, so that we may immediately go forward in fulfilling our responsibilities 
to our mutual client . . . . Doug, there are a number of other business 
opportunities I would like to discuss with you later this week or next. I will 
call you so that we may coordinate. [Emphasis added.]

 
        The 
next day, ignoring FAS’s warnings, CNB authorized release of $162,500 to Bed 
& Bath. Ruth Ann had also authorized the release, unaware of CNB’s and 
FAS’s concerns. In the SBA form documenting the release of the funds, CNB 
represented to ARI that it was advancing the $162,500 based on Bed & Bath 
furnishing a breakdown of expenses before the next draw date. Based on this 
representation, ARI signed the form.
        Sanders 
contended at trial that CNB paid the $162,500 because the advance was required 
by the construction agreement between Bed & Bath and ARI. Sanders later 
acknowledged that the construction loan agreement between ARI and CNB only 
allowed funds to be advanced for work performed, and that the construction loan 
agreement controlled if there was a conflict with any other document, including 
the construction agreement between Bed & Bath and ARI. He admitted that CNB 
was responsible for obtaining documentation from Bed & Bath concerning how 
the money would be spent. CNB did not obtain such documentation before it 
advanced the $162,500, nor did it obtain the documentation before the next draw 
was made in February 1999. At trial, Sanders admitted that when CNB authorized 
the February 1999 draw, the bank still had no idea where or how any of the money 
it had already advanced to Bed & Bath had been spent.
        Gary 
Quandt, FAS’s project manager, testified that from the initial $162,500 
advance, Bed & Bath took $43,685 as profit. The total anticipated profit for 
Bed & Bath for the whole project was $49,702. Accordingly, from the initial 
advance of $162,500, Bed & Bath realized 89% of the anticipated profit on 
the project before it had even begun construction.
        As 
construction progressed, Bed & Bath submitted future payment requests 
directly to CNB, which in turn forwarded the requests to FAS for review and 
confirmation of the completed work. Once approved by FAS, CNB paid the later 
draw requests, but only after written authorization from ARI for each 
disbursement. ARI admitted at trial that it received Bed & Bath’s draw 
requests and FAS’s recommendations on the later draw requests.
        At 
the closing, ARI had signed an “SBA Authorization” which obligated CNB to 
“[o]btain lien waivers or releases from all materialmen, contractors, and 
subcontractors involved in the construction.” Sanders explained at trial that 
one of the reasons a lender should obtain lien waivers is to ensure that the 
money is actually spent on the project.
        On 
February 23, 1999, FAS sent CNB another report regarding Bed & Bath’s 
request for a second advance. FAS objected to any more funds being paid to Bed 
& Bath until CNB obtained information supporting the initial advance. FAS 
also recommended that CNB obtain unconditional lien releases prior to funding 
this second draw request and informed CNB that FAS had not received any lien 
releases in connection with the initial $162,500 advance. Again, ARI was never 
informed about any of these concerns. Despite FAS’s objections, CNB continued 
to make advances to Bed & Bath over the next several months and never 
pursued or obtained any lien waivers on the project.
        On 
direct examination at trial, CNB vice president Linda Hestilow claimed that she 
sent FAS’s February 23, 1999 report to ARI via letter to Ruth Ann Taylor. 
Under cross-examination, however, Hestilow admitted that the FAS report was 
issued one day after she sent her letter to Ruth Ann.
        Construction 
began in December 1998. Thereafter, subcontractors began appearing at the 
principals’ homes and places of employment, complaining that they had not been 
paid and demanding payment. Materialmen and mechanic’s liens were filed 
against the property. Ultimately, Bed & Bath abandoned the construction 
project, and the project failed. Because CNB had returned the performance bond 
less than thirty days after closing, no performance bond was in place.
        CNB 
foreclosed on the project, including the real estate purchased by ARI outside 
the loan as well as the pledged ARI stock, and sold the stock at a public 
auction to LAR, a company formed by CNB three days before the foreclosure. 
Richard Barajas, a bank officer, was named the sole shareholder, sole director, 
and president of the company. Doug Sanders was named the secretary. But one day 
before the public auction, the ARI principals caused ARI to issue each of them 
200 additional shares of ARI stock, resulting in 900 shares outstanding. Ruth 
Ann admitted that this action was taken to prevent LAR from taking control of 
ARI. After LAR purchased the three hundred original shares of stock at the 
public auction, it sent a letter to Appellees claiming to be the sole owner of 
ARI and demanding all of ARI’s books and documents. The SBA ultimately 
reimbursed CNB seventy-five percent of the bank’s money advanced to Bed & 
Bath and also paid CNB’s and Lawson’s legal fees in this case.
        ARI 
filed suit against Bed & Bath and later brought a separate suit against CNB, 
its affiliate LAR, Lawson, and FAS. ARI’s original petition alleged DTPA, 
fraud, negligence, and negligent misrepresentation causes of action. Those suits 
(which were later consolidated) form the basis of this appeal. At the close of 
evidence, the trial court rendered a directed verdict that Don Lawson was acting 
in the course and scope of his employment at CNB and that CNB was therefore 
vicariously liable for his acts. Similarly, based on the jury’s conspiracy 
finding, the trial court found that CNB and Bed & Bath were liable for each 
other’s acts, and ordered Bed & Bath to pay contribution to CNB for 38% of 
any amount paid by or on behalf of CNB to ARI, plus interest. Finally, the judge 
entered a default judgment against Bed & Bath, and, in accordance with the 
jury’s findings, rendered judgment that Appellees take nothing from FAS. CNB, 
Lawson, and LAR timely appealed from the trial court’s judgment.
II. 
Legal Analysis
A. DTPA Claims
        CNB 
contends in its second issue that the trial court abused its discretion by 
allowing ARI to recover under the DTPA because ARI’s Bed & Bath project 
involved total consideration of more than $500,000; consequently, CNB concludes, 
the DTPA does not apply to ARI’s lawsuit. ARI contends that, because CNB 
advanced only $463,193.45 to ARI under its $600,000 note, the DTPA does apply. 
Section 17.49(g) of the Act provides the following exemption:
 
Nothing 
in this subchapter shall apply to a cause of action arising from a transaction, 
a project, or a set of transactions relating to the same project, involving total 
consideration by the consumer of more than $500,000, other than a cause of 
action involving a consumer’s residence.[2]

        Based 
on the parties’ representations and our own review of the law, this appears to 
be the first time that this subsection has been discussed in an appellate 
opinion. However, in a 1995 law review article, the authors, who include Senate 
and House co-sponsors of the bill resulting in the above section, point out:
 
The 
reform law has eliminated many high-dollar transactions from the reach of the 
DTPA. These changes were part of lawmakers’ efforts to maintain the DTPA as a 
viable source of relief for consumers who encounter and are harmed by 
unscrupulous business practices, but to remove from the scope of the Act . . . 
litigation between big businesses.[3]

 
The 
authors interpret the section to mean that “the DTPA will no longer govern 
transactions in which the overall consideration exceeds $500,000.”[4]
        In 
their briefs, the parties provide conflicting interpretations of the meaning of 
“total consideration by the consumer,”[5]  
with CNB contending that the promissory note of $600,000 alone bars a DTPA 
recovery and ARI contending that its consideration included only the unpaid 
principal and accrued interest due on the note at the time of foreclosure, 
$463,193.45. Under Texas case law, “[c]onsideration is a present exchange 
bargained for in return for a promise. It consists of either a benefit to the 
promisor or a detriment to the promisee.”[6]  
Similarly, in the sixth edition of Black’s Law Dictionary, consideration 
is defined as “[s]ome right, interest, profit or benefit accruing to one 
party, or some forbearance, detriment, loss, or responsibility, given, suffered, 
or undertaken by the other,” and pecuniary consideration is “consideration 
for an act of forbearance which consists either in money presently passing or in 
money to be paid in the future.”[7]
        For 
this case, however, we do not need to determine whether “consideration” as 
used in the statute involves only detriment actually incurred by the consumer or 
detriment that a consumer promises to incur in the future. The balance of 
principal and accrued interest due on the note at the time of foreclosure was 
$463,193.45. Additionally, ARI paid $22,006.08 in interest on the note before 
defaulting. Finally, ARI paid $122,096.81 to CNB at the time of closing, $90,000 
of which went to purchase the lot on which the motel would be built. Thus, 
looking only at the detriment ARI had incurred at the time of foreclosure, we 
can easily say that ARI’s overall consideration exceeded $500,000 on the Bed 
& Bath project.
        Because 
ARI’s consideration exceeded $500,000, and because the project did not involve 
a consumer’s residence,[8]  the DTPA does not 
apply to ARI’s cause of action regarding the project. Consequently, the trial 
court abused its discretion in submitting the DTPA jury question and in allowing 
ARI to recover from CNB under the DTPA.[9]  
Furthermore, the awards of trial and appellate attorney’s fees were also in 
error, because attorney’s fees are not recoverable for any other theory of 
recovery alleged by Appellees. We sustain CNB’s second issue.
        Lawson 
contends in his first issue that because ARI elected to recover against CNB 
under the DTPA, and because the jury made no DTPA liability finding against him, 
the trial court erred in awarding any judgment against him. There is no 
indication in the trial court’s judgment that the judge applied the jury’s 
DTPA liability finding against CNB to Lawson. For example, the judgment assesses 
no attorney’s fees against Lawson. Additionally, as we hold below, the trial 
court properly awarded damages against Lawson for fraud. We therefore overrule 
Lawson’s first issue.
B. Fraud Claims
        Because 
multiple theories of liability were submitted to the jury, if the verdict in 
favor of ARI can be sustained under more than one theory, then this court is 
required to use the findings affording ARI the greatest recovery and render 
judgment accordingly.[10]  Sustaining the 
verdict under the theory of fraud would afford ARI the greatest recovery because 
of the inclusion of exemplary damages; the theories of negligence and negligent 
misrepresentation do not involve exemplary damages. Additionally, the finding in 
response to Question 7, a proportionate responsibility question addressing all 
causes of action against all defendants, allows ARI a maximum recovery of 93% of 
its actual damages and all exemplary damages awarded.[11]  
We therefore analyze the fraud issues next.
1. CNB
        CNB 
argues in its third issue that the evidence is legally insufficient to support 
the jury’s finding of fraud. CNB’s only challenges to the evidence of its 
fraudulent nondisclosures, however, are ARI’s alleged contractual waivers or 
releases. That is, CNB claims that ARI acknowledged in several written 
agreements (1) that it was not entitled to certain undisclosed information; (2) 
that it was not relying on CNB to provide the undisclosed information; and (3) 
that CNB owed no duty to provide the undisclosed information. A contractual 
waiver must be knowing to be valid.[12]  
Similarly, a release must clearly and specifically disclaim reliance.[13]  We have reviewed each of the agreements in this 
case—the franchise agreement, the note, the construction loan agreement, and 
the FAS agreement—and are unpersuaded by CNB’s contentions.
        The 
franchise agreement that ARI signed with Bed & Bath provides that ARI 
“conducted an independent investigation of the business.” This document 
arguably limited Bed & Bath’s duties to ARI; it did nothing to limit 
CNB’s scope of duty to ARI.
        The 
consulting agreement ARI signed to allow FAS to act as CNB’s agent in making 
construction cost loan disbursements on the project provides:
 
Important: [FAS] is working solely for 
[CNB] as its administrative agent . . . . [FAS’s] sole obligations with 
respect to this project is to [CNB,] and [FAS] has no contractual obligation to 
[ARI], or to [ARI’s] contractor (or to their subcontractors/vendors/design 
professionals/consultants), or to any other third party. [FAS’s] review of the 
plans and specifications and of any project documentation for [CNB] shall not be 
construed as a representation by [FAS], or by [CNB], as to the content, 
completeness, quality, correctness, or sufficiency of such documents. [ARI] and 
its contractors are responsible for all independent architectural, engineering 
and other expert inspection and observation.

        While 
this documents did absolve FAS of any duty to disclose to ARI, it did not 
absolve CNB of its duty to disclose material information that it gained from FAS.
        Similarly, 
the note includes ARI’s agreement “to take all necessary steps to 
administer, supervise, preserve, and protect the Collateral; and regardless of 
any action taken by [CNB], there shall be no duty upon [CNB] in this respect,” 
and the construction loan agreement expressly provides that any action taken by 
CNB to inspect the project or review the plans was done for its own protection 
and not for the benefit of ARI. While these documents provide that CNB has no 
duty to protect the collateral, they do not contain a specific, valid release or 
waiver executed by ARI that would allow CNB to withhold material information 
that it received from Bed & Bath or FAS.
        Because 
CNB has pointed us to no evidence that shows ARI executed a specific, valid 
contractual release or waiver that in any way absolved CNB of its duty to 
disclose to ARI such material information as Bed & Bath’s failure to 
provide adequate financial statements, CNB’s reluctance to direct any more 
customers to Bed & Bath because of Bed & Bath’s failure to provide 
financial information, FAS’s recommendation that the initial advance not be 
made before any work was completed, and Bed and Bath’s failure to ever 
document how that initial advance was spent, we hold that the evidence is 
legally sufficient to uphold the jury’s finding of fraud. Having found that 
the evidence is legally sufficient to uphold the jury’s finding of fraud based 
on CNB’s nondisclosures of material information to ARI, we do not reach 
CNB’s challenge to the legal sufficiency of the evidence of fraud based on 
CNB’s misrepresentations.[14]  We overrule 
CNB’s third issue.
2. Lawson
        In 
his second issue, Lawson contends that the trial court erred in not ruling that 
ARI’s claims were barred as a matter of law on the basis of contractual 
waiver, ratification, and/or estoppel. ARI responds that Lawson failed to raise 
this issue below and failed to provide any record citation to a ruling or 
opportunity to rule. In a jury trial, a matter-of-law issue must be preserved 
through a motion for instructed verdict, a motion for judgment notwithstanding 
the verdict (“n.o.v.”); an objection to the submission of the question to 
the jury; a motion to disregard the jury’s answer to a vital fact question; or 
a motion for new trial.[15]
        While 
Lawson made some objections to the jury charge and filed a motion for judgment 
n.o.v., a motion to disregard, and a motion for new trial, none of these 
documents mention Lawson’s second issue on appeal. Further, the record 
citations that Lawson provided in his brief and reply brief do not show that the 
trial court was presented with any specific request to rule that ARI’s fraud 
claims were barred by the properly pled affirmative defenses of waiver, 
ratification, or estoppel.[16]  Because Lawson 
failed to preserve this issue in the trial court, his complaint is waived. We 
overrule his second issue.
        In 
his third and fourth issues, Lawson argues that the evidence is legally and 
factually insufficient to support the fraud finding because he had no duty to 
disclose the concealed information to Appellees and because the information was 
immaterial. For there to be actionable fraudulent nondisclosure, there must be a 
duty to disclose.[17]  Whether such a duty 
exists is a question of law.[18]  A duty to 
disclose may arise in a commercial context in four situations: 1) when there is 
a fiduciary relationship between the parties; 2) when one voluntarily discloses 
information, the whole truth must be disclosed; 3) when one makes a 
representation, new information must be disclosed when that new information 
makes the earlier representation misleading or untrue; or 4) when one makes a 
partial disclosure and conveys a false impression.[19]  
There was no fiduciary relationship between Lawson and Appellees.[20]
        When 
pitching the Bed & Bath project to Appellees, however, Lawson did not 
disclose CNB’s prior relationship with Bed & Bath, his ambivalence about 
Bed & Bath’s ability to deliver on the profits it promised to CNB from 
their business relationship, or the fact that neither CNB nor he himself had 
investigated Bed & Bath’s financial condition. We hold that the evidence 
establishes that Lawson had a duty to fully disclose this information under the 
second scenario described above, and he breached that duty.
        After 
the loan was approved, Lawson sought required financial information from Bed 
& Bath so construction could begin. Bed & Bath did not respond. On April 
8, 1998, Lawson wrote to Bed & Bath and requested year-end 1997 balance 
sheets, income statements, tax returns, and financial documents. His memo read, 
in part:
 
As 
you can understand, we are expected by our customers and SBA to do our due 
diligence to assure that you can perform on your commitment to the franchisee. 
Ruth Narramore is also calling and wanting to know what the hold up is on 
construction and I, quite frankly[,] don’t have an answer. We have sent 
several referrals to you for this project. We feel there are many more that we 
would send, but are starting to lose our enthusiasm by having to work so hard at 
getting initial information from you. This is considered an urgent problem to 
Doug and I. We could be on the verge of losing a deal we switched from Motel 6 
to you because of the delay.
 
        The 
evidence shows that Lawson did not provide copies of this memo to ARI or tell 
ARI that CNB was losing enthusiasm for the project or that an “urgent 
problem” existed because Bed & Bath would not send legitimate financial 
information to CNB. Further, Bed & Bath never fully complied with 
CNB’s demands. Lawson admitted that he never received the tax returns he 
requested. Lawson also admitted that the tax returns he sought would have been a 
reliable source to verify Bed & Bath’s income.
        On 
May 26, 1998, having still not received the requested information, Lawson sent 
Bed & Bath another memo stating that CNB would not go forward with any other 
Bed & Bath projects until Bed & Bath performed on the ARI project. 
Lawson did not give this memo to ARI and did not disclose to ARI that CNB was no 
longer recommending Bed & Bath to its customers. Ruth Ann testified that she 
never saw or received a copy of either memo before Appellees filed suit. In a 
letter dated May 25, the day before this memo to Bed & Bath, Lawson informed 
ARI of the information that would be needed to close the loan and made no 
reference to the problems with Bed & Bath.
        Lawson 
argues that, at most, the statements he made in the memos described his feelings 
or opinion that CNB employees were beginning to feel frustrated with Bed & 
Bath’s unwillingness to provide needed documentation. Whether a statement is 
an actionable statement of “fact” or merely an innocuous statement of 
“opinion” often depends on the circumstances in which a statement is made.[21]  Among the relevant circumstances are the 
statement's specificity, the speaker's knowledge, the comparative levels of the 
speaker's and the hearer's knowledge, and whether the statement relates to the 
present or the future.[22]  Here, Lawson 
testified that, in fact, CNB was starting to lose enthusiasm for the project. He 
said that when he wrote the April 8, 1998 memo mentioning CNB’s loss of 
enthusiasm, he was “frustrated” with Bed & Bath, and his frustration was 
building. The jury could have found these two statements to be statements of 
fact, not mere opinion. CNB in fact was losing enthusiasm for the project, and 
Lawson in fact was frustrated with Bed & Bath.
        Lawson 
also argues that, regardless of a duty owed, the evidence shows that ARI was not 
ignorant of the substance of these memoranda. We disagree. The record shows that 
ARI knew Bed & Bath was not getting its “paperwork” in to CNB. Ruth Ann 
testified that CNB had told her that Bed & Bath was “slow in getting their 
paperwork in.” She also testified that Appellees wanted to back out of the 
deal one week before the loan closed because they “couldn’t imagine how [the 
deal] could go forward if [Bed & Bath was] going to be this slow about 
getting the paperwork together.” But she also testified that had Appellees 
known that CNB had lost enthusiasm for the project and was not going to 
recommend any other clients to Bed & Bath, they would not have closed on the 
deal.
        As 
to Lawson’s duty, the record shows that Ruth Ann said that ARI “couldn’t 
figure out what the delay was” and “kept calling the bank asking them why” 
the loan had not yet closed. Lawson testified that he had phone conversations 
with the principals of ARI about CNB “having a problem getting current 
information” from Bed & Bath. The evidence shows that ARI was unaware of 
the nature of Bed & Bath’s noncompliance and the urgency and importance 
Lawson placed on the noncompliance. Ruth Ann knew that Bed & Bath was slow 
in getting paperwork in, but she did not know about CNB and Lawson’s loss of 
enthusiasm, frustration, and decision not to recommend Bed & Bath to others. 
Under the circumstances, Lawson provided only partial disclosures to Appellees. 
Lawson’s partial disclosures left a false impression with Appellees that 
induced them to continue with the project and close the loan. Accordingly, we 
hold that Lawson did not meet his duty under the fourth scenario listed above.[23]
        Lawson 
contends that the alleged nondisclosures were immaterial. “Material” 
information is that which a reasonable person would attach importance to and 
would be induced to act on in determining his choice of actions in the 
transaction in question.[24]  The record 
supports ARI’s assertion that Lawson’s nondisclosures were material. Ruth 
Ann testified that had ARI known that CNB and Lawson had lost enthusiasm for the 
project and were not going to recommend any other clients to Bed & Bath, ARI 
would have pulled out of the deal before closing.
        Lawson 
argues that ARI had equal access to the financial information of Bed & Bath 
and that ARI had acknowledged in its franchise agreement with Bed & Bath 
that it performed its own independent investigation of Bed & Bath. That 
argument is irrelevant. The issue before us is not whether Lawson had informed 
ARI of Bed & Bath’s financial condition, but whether Lawson made a 
fraudulent nondisclosure by not informing ARI of CNB and Lawson’s concerns 
about Bed & Bath’s failure to comply with CNB’s requirements for the 
construction process. ARI did not have equal access to this information, which 
was located in CNB’s files. We conclude that Lawson’s acts of fraudulent 
nondisclosure were material.
        Applying 
the appropriate standards of review,[25] we hold that 
the evidence is legally and factually sufficient to support the jury’s finding 
of fraud. We overrule Lawson’s third issue and that part of his fourth issue 
related to the fraud finding.
        In 
his fifth issue, Lawson contends that the evidence is legally and factually 
insufficient to support the jury’s finding that he is proportionately 
responsible for 15% of the damages suffered by Appellees. From our review of his 
brief, this issue is solely dependent upon a holding that the evidence is 
legally and factually insufficient to support the jury finding that Lawson 
committed fraud. Lawson offers no other arguments in support of this issue. 
Because we have already held that the evidence is legally and factually 
sufficient to support the jury finding that Lawson committed fraud, we overrule 
Lawson’s fifth issue. We do not reach Lawson’s sixteenth, seventeenth, 
eighteenth, and nineteenth issues as to negligence and negligent 
misrepresentation.[26]
3. Actual Damages
a. Out-of-Pocket Costs
        CNB 
does not challenge the damages awarded ARI for its out-of-pocket costs 
($172,102.89). In his seventh issue, however, Lawson contends that the evidence 
is legally and factually insufficient to prove that his actions proximately 
caused all of Appellees’ actual damages from the lost project. Specifically, 
he claims that the franchise fee and loan application fee ($28,500) were paid 
before any alleged fraudulent conduct occurred and that the record does not show 
that the collapse of the project was foreseeable from any failure to reveal his 
frustration with Bed & Bath.
        As 
we discussed above, the record shows that Lawson failed to disclose pertinent, 
material information from his first face-to-face contact with Ruth Ann Narramore. 
He testified that he thought the Bed & Bath presentation he had attended a 
week before he met with Ruth Ann was “hit or miss,” and he “didn’t buy 
into the Bed & Bath sales pitch.” He nevertheless recommended the Bed 
& Bath project to Ruth Ann, gave her a copy of the Bed & Bath brochure 
he had received from Bed & Bath, and discussed it with her. At no point in 
this discussion did Lawson reveal any information about his or CNB’s prior 
relationship with Bed & Bath or any of his own doubts about Bed & 
Bath’s claims. He pushed the Bed & Bath project, telling Ruth Ann that a 
Bed & Bath motel would cost less and could be built faster than a Motel 6 
and that CNB would extend a U.S. Small Business Administration (SBA) loan on the 
Bed & Bath project, but not on another project. When Lawson recommended Bed 
& Bath to Appellees, neither Lawson nor CNB had conducted any due diligence 
regarding the company, investigated whether the information in the brochure was 
correct, or determined the creditworthiness of Bed & Bath. At the time of 
this conversation, Appellees had paid neither the franchise fee nor the loan 
application fee.
        Additionally, 
the jury heard evidence that if Appellees had known that CNB and Lawson had lost 
enthusiasm for the project and were not going to recommend any other clients to 
Bed & Bath, ARI would have pulled out of the deal before closing. We hold 
that the evidence was legally and factually sufficient to support a finding that 
Lawson’s fraudulent nondisclosures, along with those of other defendants, 
proximately caused all of the damages resulting from the lost project. We 
overrule Lawson’s seventh issue.
b. Loss of Credit Reputation
        In 
its first issue, CNB contends that the evidence is legally insufficient to 
support the jury award of $650,000 in damages for ARI’s loss of credit 
reputation. In his sixth issue, Lawson contends that the evidence is legally and 
factually insufficient to support the award. More specifically, CNB and Lawson 
contend that no evidence exists as to causation or damages.
        After 
defaulting on the CNB note, ARI received a demand letter from CNB informing it 
that it had eleven days to pay CNB approximately $17,000 or CNB would accelerate 
the note. In June 2000, within days of filing suit against CNB, Ruth Ann wrote a 
letter to Decatur Banking Center (DBC) “to get a loan to move this project 
forward and finish it.” The letter, in its entirety, reads as follows:
 
To: 
[DBC]
From: 
[ARI]
Re:Proposal 
is for a one year note to pay off [CNB] to prevent foreclosure.
 
The 
contractor for the job took the money advanced and walked off the job. [ARI] 
needs time to finish the project (with a second lien after all estimates are in) 
or sell to a new operator.
 
The 
loan amount needs to be $495,000 to pay off [CNB] to stall foreclosure.
 
The 
project is located on Hwy 287N. It features 22 rooms and was expected to open 
December 1998. Estimated income for the property when open for business will be 
approximately $166,200 a year. With debt service at $66,000. These figures are 
at a 75% occupancy rate.
 
Thank 
you for your time.

 
Nothing 
in the record shows that ARI sent the bank any shareholder credit reports, 
financial information, or a project description; pledged collateral or offered 
personal guaranties as to loan repayment; or provided any other supporting 
information upon which DBC could base its review for extending a loan to ARI. In 
response to ARI’s letter, DBC sent the following one-paragraph letter to Ruth 
Ann:
   
Per 
our telephone conversation on this same date, First National Bank of Bowie will 
be unable to help [ARI] with its loan request. The reasons are uncertainty 
regarding the ultimate completion of the project, the economic viability of the 
project, and suspect sources of repayment.
 
Thank 
you for the opportunity to look at this request. [Emphasis added.]

 
        The 
record does not show that ARI attempted to obtain another loan from any other 
bank after becoming dissatisfied with CNB. Ruth Ann testified that before 
ARI’s dealings with CNB, ARI was able to obtain at least a $600,000 loan, and 
after its dealings with CNB, it could not do so. Ruth Ann testified that ARI’s 
credit had been damaged in at least the amount of $600,000. Ruth Ann also 
testified that she believed that because of ARI’s dealings with CNB, ARI’s 
credit reputation had been damaged. Ruth Ann’s June letter to DBC, DBC’s 
one-paragraph denial, and Ruth Ann’s testimony constitute the entire body of 
evidence as to damaged credit reputation.
        Loss 
of credit is recoverable as actual damages in a suit where the damage to credit 
was the necessary and usual result of the defendant's action.[27] 
To show damage to its credit reputation, a plaintiff must show that its 
inability to obtain a loan “resulted in injury and proof of the amount of that 
injury.”[28]  Courts have found that actual 
damages are shown where a party’s loan is actually denied or a higher interest 
rate is charged,[29] and where a party who could 
obtain a loan from a bank without collateral prior to a disagreement with a 
creditor may obtain a loan afterwards only if collateral or other condition is 
imposed.[30]
        ARI 
argues that DBC’s letter refusing to lend ARI $495,000 was sufficient evidence 
of injury. We disagree. The crucial inquiry in this case is whether credit 
problems ARI suffered after Appellants’ fraudulent conduct were different from 
any credit problems it experienced before Appellant’s fraudulent conduct.[31] In making this inquiry, we must determine whether the 
circumstances under which ARI applied for credit after the conduct were the same 
or similar to the circumstances under which it applied before the conduct.[32]  This inquiry requires us to look at a 
before-and-after picture of the circumstances under which ARI attempted to 
secure credit.
        Looking 
at the “before” picture of ARI’s credit capabilities, Ruth Ann testified 
that ARI had problems obtaining a loan before coming to CNB based on its desire 
to pay only ten-percent down. Although the record does not show what information 
ARI submitted to The Money Store to obtain its prequalification letter for 
$576,000, the record does show that ARI acknowledged that all of the 
applications it had made for loans through several lending institutions were 
based on the principals’ personal credit histories and personal financial 
statements. Likewise, the only loan actually approved for ARI, the CNB loan, was 
approved based on the principals’ personal credit histories and financial 
statements.
        As 
to the “after” picture, the record shows that ARI sent a short letter to DBC 
asking for a $495,000 loan, and DBC refused in writing. Neither letter mentions 
anything about the principals’ personal credit histories, personal financial 
statements, or equity investment. In addition, no evidence exists that Appellees 
submitted financial information, credit histories, or project descriptions or 
made collateral pledges or personal guaranties to DBC. At oral argument, ARI 
contended that DBC’s reason for rejecting ARI’s loan proposal based on 
“suspect sources of repayment” necessarily implied that the shareholders 
provided financial information to DBC. Because an inference based upon an 
inference does not constitute evidence,[33] the jury 
could not properly infer from the nature of DBC’s letter that the principals 
had submitted their financial information with Ruth Ann Taylor’s proposal 
letter and in turn infer that DBC had rejected the loan based on that 
information.
        Applying 
the well established standard of review for legal sufficiency of the evidence,[34]  we hold that the record contains less than a 
scintilla of evidence to enable the jury to conclude that ARI suffered any 
injury to its credit reputation. Ruth Ann’s testimony that ARI’s credit had 
been damaged was merely unsupported opinion.[35]  
ARI did not show any damage by establishing that prior to CNB’s conduct it 
could obtain a loan with an equity investment, personal guaranties, and personal 
credit histories because the evidence does not show that ARI could not have 
obtained a loan from DBC after CNB’s wrongful conduct if ARI had given the 
same credit information and made the same assurances.[36]  
A party cannot recover damages based on speculation or conjecture.[37]  We sustain CNB’s first issue and Lawson’s 
sixth issue. Because we have sustained Lawson’s sixth issue, we do not reach 
his eighth issue, which alternatively requests remittitur.
4. Exemplary Damages
a. Clear and Convincing Evidence of Fraud
        CNB 
does not challenge the exemplary damages award against it.
        Lawson 
argues in his fourth, tenth, and eleventh issues that the evidence of fraud is 
legally and factually insufficient to satisfy the clear and convincing standard. 
The Texas Civil Practice and Remedies Code requires a plaintiff seeking the 
recovery of exemplary damages resulting from fraud to establish the elements of 
fraud “by clear and convincing evidence.”[38]  
For exemplary damages purposes, clear and convincing evidence is defined as that 
“measure or degree of proof that will produce in the mind of the trier of fact 
a firm belief or conviction as to the truth of the allegations sought to be 
established.”[39]  This intermediate standard 
falls between the preponderance standard of civil proceedings and the reasonable 
doubt standard of criminal proceedings.[40]  
While the proof must weigh heavier than merely the greater weight of the 
credible evidence, there is no requirement that the evidence be unequivocal or 
undisputed.[41]
        This 
higher burden of proof alters the appellate standard of legal sufficiency 
review.[42]  In reviewing the evidence for legal 
sufficiency, we must determine “whether the evidence is such that a factfinder 
could reasonably form a firm belief or conviction” that the allegations in the 
petition were proven.[43]  We must review all 
the evidence in the light most favorable to the finding and judgment.[44] This means that we must assume that the factfinder 
resolved any disputed facts in favor of its finding if a reasonable factfinder 
could have done so.[45]  We must also disregard 
all evidence that a reasonable factfinder could have disbelieved.[46]  We must consider, however, undisputed evidence 
even if it does not support the finding [47]
        This 
higher burden of proof also alters the appellate standard of factual sufficiency 
review.[48]  “[A] finding that must be based 
on clear and convincing evidence cannot be viewed on appeal the same as one that 
may be sustained on a mere preponderance.”[49]  
In considering whether the evidence rises to the level of being clear and 
convincing, we must determine “whether, on the entire record, a factfinder 
could reasonably form a firm conviction or belief” that the allegations in the 
petition were proven.[50]
        The 
evidence most favorable to the verdict has already been detailed with reference 
to the fraud claim; it is also relevant to the exemplary damages finding. 
Because we are required, whether reversing or affirming the award, to detail all 
the evidence and explain why the jury's finding is supported by factually 
sufficient evidence or so against the great weight and preponderance of the 
evidence as to be manifestly unjust, we must also review any evidence and 
inferences that are against the verdict.[51]
        The 
jury could have properly found by clear and convincing evidence that Lawson made 
fraudulent nondisclosures to Appellees that left them with a false impression as 
to the stability of the Bed & Bath project at a time when he knew they were 
considering backing out of the deal. The evidence further confirms that Lawson's 
nondisclosures resulted in a failed venture for Appellees. However, the jury 
also heard Ruth Ann’s testimony that she believed Bed & Bath quite 
possibly fooled Lawson just as it had fooled ARI and that she did not think 
Lawson had intended to harm her or ARI. It further heard testimony that 
Appellees knew that Bed & Bath was not getting its paperwork in on time. 
Despite hearing this evidence favorable to Lawson, the jury chose to believe 
Appellees and found that the evidence clearly and convincingly showed that fraud 
had occurred.
        Giving 
due deference to the jury's role in determining the weight and credibility to be 
given a witness's testimony, we hold that the jury's award of exemplary damages 
is supported by clear and convincing evidence. The evidence, therefore, is 
legally and factually sufficient to support an award of exemplary damages. 
Having held that the evidence is sufficient to support the jury's firm belief in 
the finding of fraud, we overrule Lawson's tenth issue and the remaining portion 
of his fourth issue. We also overrule that portion of his eleventh issue 
complaining of the sufficiency of the evidence to support the fraud finding.
b. Reasonableness of Amount of Damages
        In 
his eleventh issue, Lawson argues that the evidence is legally and factually 
insufficient to support the exemplary damage award. In his twelfth issue, Lawson 
argues that the failure of part of the award of actual damages requires reversal 
of the exemplary damage award. In his thirteenth issue, he argues that the award 
violates constitutional, statutory, and common law constraints, and in his 
fourteenth issue, he alternatively argues that this court should order a 
remittitur.
        This 
court reviews the excessiveness of an exemplary damages award under state law as 
a factual sufficiency challenge.[52]  We may 
only reverse if the exemplary damages award is so against the great weight and 
preponderance of the evidence as to be manifestly unjust.[53]  
Exemplary damages are recoverable where, as here, a plaintiff proves by clear 
and convincing evidence that the harm for which he seeks exemplary damages 
resulted from fraud.[54]  No set rule or ratio 
between actual and exemplary damages exists to determine whether an exemplary 
damages award is excessive.[55]  Factors we 
consider in determining the reasonableness of an award include: (1) the nature 
of the wrong; (2) the character of the conduct involved; (3) the degree of 
culpability of the wrongdoer; (4) the situation and sensibilities of the parties 
concerned; and (5) the extent to which conduct offends a public sense of justice 
and impropriety.[56]  Lawson’s chief complaint 
is that the exemplary damages awarded do not relate to the nature of the wrong 
he allegedly committed, the extent or type of harm resulting from such conduct, 
the character of his alleged conduct, or the degree of culpability. The amount 
of exemplary damages awarded rests largely in the discretion of the jury.[57]
        Here, 
there was evidence from which the jury could have found that Lawson’s 
nondisclosures involving his and CNB’s worries as to Bed & Bath’s 
failure to comply with their request for financial information were made with 
callous indifference to the effect of that failure on ARI. The jury had before 
it evidence that Lawson had on several occasions requested the information and 
had told ARI that Bed & Bath was not getting the paperwork in to CNB, but 
ARI had no knowledge of Lawson’s and CNB’s outlook on the project.
        This 
degree of indifference toward ARI justified the award of exemplary damages. 
Furthermore, the nature of Lawson’s actions and the degree to which this type 
of conduct must be deterred in the future support the award. The jury was 
properly instructed on the Kraus factors, and the record contains 
competent evidence to support the award. We hold that the evidence is factually 
sufficient to support the award. Evidence which is factually sufficient is 
necessarily legally sufficient.[58]  We overrule 
the remaining portion of Lawson’s eleventh issue and that portion of his 
thirteenth issue contending that the award violates Texas common law 
constraints.
        The 
award also lies well within statutory and constitutional boundaries. The jury 
and trial court assessed against Lawson actual damages of $123,390.43. The 
exemplary damages awarded against him were $65,000. Because we have reversed the 
$650,000 damage award for loss of credit reputation, actual damages remaining 
against Lawson amount to $25,890.43.
        Allowing 
the $65,000 exemplary damage award against him to stand, even with actual 
damages reduced, does not violate statutory constraints. Section 41.008 of the 
Texas Civil Practice and Remedies Code provides:
 
(b) 
Exemplary damages awarded against a defendant may not exceed an amount equal to 
the greater of:
 
                (1)    (A)    two 
times the amount of economic damages; plus
 

 
 (B) an amount equal to any noneconomic damages found 
 by the jury, not to exceed $750,000; or
 

 
                (2)    $200,000.[59]
 
        Even 
when an exemplary damages award is reasonable under governing state law, 
however, it may violate a party’s substantive due process right to protection 
from “grossly excessive” damages.[60]  To 
determine whether an award is “grossly excessive,” a reviewing court 
considers “(1) the degree of reprehensibility of the defendant’s misconduct; 
(2) the disparity between actual and punitive damages; and (3) a comparison of 
the punitive damages awarded and other civil or criminal penalties that could be 
imposed for similar conduct.”[61]
        The 
record reflects ample evidence that Lawson callously disregarded the effects 
that the information he concealed about Bed & Bath would have on Appellees. 
Lawson’s level of misconduct supports the award.
        The 
disparity between the exemplary damages and actual damages as reduced by this 
court also supports the award. The ratio of exemplary damages to actual damages 
is slightly more than 2.5 to 1. Although the precise award in any case must be 
based upon its particular facts and circumstances, the U.S. Supreme Court has 
noted that we have “a long legislative history, dating back over 700 years and 
going forward to today, providing for sanctions of double, treble, or quadruple 
damages to deter and punish.”[62]  Based on 
the evidence, the exemplary damages assessed against Lawson reasonably 
accomplish the purpose of punishing Lawson and deterring others.[63]
        Finally, 
under the third guidepost, we note that the jury could have awarded damages 
against Lawson of up to $200,000.[64]  This 
comparison also supports the award. We hold that the award of exemplary damages 
against Lawson does not violate statutory, constitutional, or common law 
constraints. We overrule the remaining portion of Lawson’s thirteenth issue.
        In 
his twelfth issue, Lawson contends that we should reverse the exemplary damages 
award because of the failure of part of the original actual damage award. In his 
fourteenth issue, he requests that we suggest a remittitur. Because we have held 
that the award does not violate any state or federal constraints and that the 
evidence is factually sufficient to support the award, we see no basis for 
reversal or remittitur.[65]  We overrule 
Lawson’s twelfth and fourteenth issues.
C. Prejudgment Interest
        In 
CNB’s fourth issue and Lawson’s fifteenth issue, they contend that the trial 
court abused its discretion in calculating prejudgment interest. The trial court 
computed the amount of prejudgment interest from October 10, 1999, the date the 
initial suit was filed against Bed & Bath. CNB and Lawson contend that the 
accrual date should have been June 9, 2000, the date ARI filed a separate suit 
against them, even though their suit later was consolidated with the Bed & 
Bath suit. We agree.
        An 
award of prejudgment interest advances two ends: 1) achieving full compensation 
to plaintiffs; and 2) expediting both settlements and trials.[66]  
The two legal sources for a prejudgment interest award are 1) general principles 
of equity, and 2) an enabling statute.[67]  The 
enabling statute, Texas Finance Code section 304.104, only applies to wrongful 
death, personal injury, and property damage cases.[68]  
Where no statute controls the award of prejudgment interest, the decision to 
award prejudgment interest is left to the sound discretion of the trial court, 
which should rely upon equitable principles and public policy in making this 
decision.[69]  However, once the trial court 
decides to award equitable prejudgment interest, the trial court must follow the 
accrual rule set forth in the enabling statute.[70]  
Consequently, regardless of whether prejudgment interest is awarded pursuant to 
the Texas Finance Code or common law, it does not accrue until the earlier of 1) 
180 days after the date a defendant receives written notice of a claim against 
it, or 2) the date the suit was filed.[71]
        The 
parties have directed us to no evidence that CNB and Lawson received written 
notice of claims against them until the date suit was filed against them. The 
fact that CNB and Lawson asked that their case be consolidated with the Bed 
& Bath suit is of no consequence to the correct accrual date for computing 
prejudgment interest; the consolidation occurred after suit against CNB and 
Lawson was filed.
        In 
a similar case, the Austin Court of Appeals explained:
 
Here, 
the purpose of encouraging settlements would not be served if prejudgment 
interest began to run from December 12, 1997, the date AT & T filed suit 
against Qwest and C & S, because CK had received no notice at that time that 
AT & T asserted a claim against it. On January 23, 1998, the date C & S 
sued CK, CK received notice and an opportunity to settle the claim with C & 
S; however, AT & T had yet to present notice to CK of a claim; as of this 
date CK was a named defendant only as to C & S. Nelson had not yet been 
named as a defendant. AT & T argues that because the district-court judgment 
found Qwest and C & S jointly and severally liable to AT & T for the 
damages caused by CK, prejudgment interest should begin to run against CK on 
December 12, 1997. AT & T posits that by virtue of this holding, it would 
have been entitled to the damages caused by CK from Qwest and C & S without 
suing CK and prejudgment interest would have run from December 12, 1997. 
Therefore, it should not be penalized for filing suit against CK, which would 
result from designating the May 5, 2000 date as the date that prejudgment 
interest began to run against CK. AT & T directs this Court to no authority 
in support of this proposition, and we have found none. The fact remains that 
AT & T made no claim against CK to which it could respond until AT & T 
actually named CK as a defendant. In the hypothetical scenario described by 
AT & T, CK would not be liable for prejudgment interest. Only Qwest and C 
& S would be liable. We hold that AT & T did not give the required 
notice of its claim to CK until May 5, 2000, when AT & T amended its 
petition to name CK as a defendant. Only then was CK required to consider 
whether it should settle with AT & T.[72]

 
Thus, 
the Austin court held that the correct accrual date for prejudgment interest 
assessed against a defendant was dependent upon when that defendant got notice 
of the lawsuit.[73]  We hold that the purposes 
of prejudgment interest would not be served by awarding prejudgment interest 
against CNB and Lawson from the date the suit against Bed & Bath was filed. 
The trial court therefore abused its discretion in using October 11, 1999, as 
the accrual date for prejudgment interest assessed against CNB and Lawson. We 
further hold that on remand, the prejudgment interest assessed against these two 
defendants is to be computed from the accrual date of June 9, 2000, the date 
that Appellees filed suit against them. We sustain CNB’s fourth issue and 
Lawson’s fifteenth issue.
D. The Jury Charge
1. ARI’s Fraud Defense
        In 
CNB’s fifth issue, it contends that the trial court abused its discretion by 
submitting a jury question on the affirmative defense of fraud when Appellees 
never pled that defense, or any other matter of avoidance, and offered no 
controverting evidence on the value of the deficiency.
        We 
review a jury charge under an abuse of discretion standard.[74]  
An abuse of discretion occurs only when the trial court acts without reference 
to any guiding principles.[75]  The guiding 
principle for the submission of issues to the jury is that litigants are 
entitled to have controlling issues submitted to the jury if they are properly 
pled and supported by some evidence.[76]  
Generally, then, an affirmative defense must be pled.[77]  
The purpose of pleading is to give the adversary parties notice of each 
party’s claims and defenses as well as notice of the relief sought.[78]  Pleading the actual legal term is not required, so 
long as notice is given.[79]
        In 
their live petition, Appellees contended,
 
[D]espite 
the fact that [CNB] switched [Appellees] into a relationship with Bed & 
Bath, and despite the fact that Bed & Bath did not perform as represented by 
the bank and its officers, [CNB] foreclosed on the project. . . . This 
foreclosure was based upon the above-referenced loan that was procured and 
induced by the acts and omissions of [CNB].

 
Appellees 
also raised fraud and fraudulent inducement:
 
[CNB] 
made one or more material misrepresentations to [Appellees]. The 
misrepresentations include, but are not limited to, false statements of fact, 
promises of future performance made with an intent not to perform as promised, 
statements of opinion based on a false statement of fact, statements of opinion 
that [CNB] knew to be false, or expressions of an opinion that were false. The 
misrepresentations made by [CNB] were made with knowledge of [their] falsity or 
made recklessly without any knowledge of the truth and as a positive assertion 
and made with the intention that [Appellees] act in reliance upon them. 
[Appellees] sustained damages more fully set forth below by acting in reliance 
upon the misrepresentations made by [CNB].

 
Under 
the “Actual Damages” heading, Appellees included “benefit of the 
bargain” damages, specifically “amounts advanced on the loan for the Bed 
& Bath project and interest on the amounts advanced.”
        CNB 
counterclaimed for the deficiency between the balance of the note before the 
foreclosure and after the foreclosure, stating that ARI was liable as the 
principal obligor, and the principals were liable as a result of their status as 
guarantors. CNB also sought attorney’s fees for prosecuting and appealing the 
claim. Over CNB’s objection, the trial court submitted a question to the jury 
asking whether Appellees’ failure to comply with the terms of the note was 
excused by CNB’s fraud.
        In 
our view, Appellees’ petition raises fraud as both a cause of action for 
actual damages and an affirmative defense for damages they would be obligated to 
pay as benefit-of-the-bargain damages but for CNB’s fraud. We hold that 
Appellees’ allegations of facts constituting fraud, their raising of fraud and 
fraudulent inducement as claims, and their including the amount sought by CNB in 
the damages requested all demonstrated Appellees’ contention that their 
default on the note should be excused (that is, they should not have to pay the 
deficiency) because of CNB’s fraud. Thus, Appellees’ pleadings clearly 
raised fraud as an affirmative defense. The trial court did not abuse its 
discretion in submitting the question. We overrule CNB’s fifth issue.
2. Lawson’s Defenses
        In 
his ninth issue, Lawson contends that the trial court abused its discretion in 
refusing to submit his requested statute of limitations, waiver, ratification, 
estoppel, intervening cause, and mitigation instructions and questions to the 
jury. Because we do not reach his negligence and negligent misrepresentation 
issues, we also do not reach the related defenses of statute of limitations and 
intervening cause. The disputed defenses before us, then, are waiver, 
ratification, estoppel, and mitigation.
        An 
appellate brief must contain a clear and concise argument for the contentions 
made, with appropriate citations to authorities and to the record.[80]  An issue is sufficient if it directs the appellate 
court to the error about which complaint is made.[81]  
An appellate court is not required to search the appellate record, with no 
guidance from the briefing party, to determine if the record supports the 
party’s argument.[82]  Thus, an inadequately 
briefed issue may be waived on appeal.[83]  In 
arguing this issue, Lawson cites to the entirety of Appellants’ proposed jury 
charge and instructions, some fifty-two pages. It is not our duty to comb 
through the fifty-two pages to determine whether he actually raised questions 
and instructions on the defenses; it is his. Lawson has thus waived this issue 
for appeal.  We overrule Lawson’s ninth issue.
E. 
The 300 Shares of Stock
        In 
its sole issue on appeal, LAR contends that it is the rightful owner of the 
three hundred shares of ARI stock it purchased at the foreclosure sale because 
there is no evidence of unjust enrichment. It also argues that cancelling the 
other 600 shares is the only appropriate remedy for Appellees’ issuance of the 
shares to hinder, delay, or defraud CNB and that the trial court should have 
submitted a charge on cancelling the shares.
        At 
trial, Appellees asked that the foreclosure sale at which LAR acquired the three 
hundred shares be nullified and that the shares be returned to them. This issue 
was submitted to the jury based on Appellees’ cause of action for unjust 
enrichment:
 
QUESTION 
9
 
Did 
[LAR] obtain the 300 shares of stock in [ARI] by fraud, duress or the taking of 
undue advantage?

 
The 
jury answered “yes” to Question 9 and later answered “yes” to Question 
14, inquiring whether the shares should be returned to the three 
principals.  Judgment was entered ordering LAR to return the shares to 
ARI’s principals.
        LAR 
challenges the jury’s finding on Question 9, arguing that no evidence was 
presented at trial that LAR had acted improperly in foreclosing on ARI’s 
stock.  After our review of the record, disregarding all evidence and 
inferences to the contrary, we hold that more than a scintilla of evidence 
exists to support the jury’s finding in Question No. 9.
        On 
July 14, 2000, Appellees were notified that the original three hundred shares of 
ARI stock pledged as collateral would be sold at foreclosure on July 31, 
2000.  Ruth Taylor immediately thought CNB’s foreclosure was nothing more 
than a ruse to take majority control of ARI and dismiss ARI’s pending lawsuit 
against CNB. CNB paid the $1,000 initial capital to form LAR, which was formed 
three days before the public sale of ARI’s assets.  Doug Sanders was 
named an officer of LAR.  Richard Barajas, a CNB officer who had been on 
the loan committee that approved ARI’s loan, was named president of LAR.  
Barajas had never known CNB to create such a “side company.”  Barajas 
also admitted that LAR was never a separate company, was formed to look after 
CNB’s interests, and was always under CNB’s control.  Furthermore, 
Barajas admitted that LAR failed to comply with several provisions of the notice 
of foreclosure and that this was a misrepresentation to Appellees. The jury 
found that LAR obtained the three hundred ARI shares by fraud, duress, or the 
taking of undue advantage. We hold that sufficient evidence exists to support 
the jury’s finding in Question 9.[84]  Because 
we have held that the jury properly awarded the three hundred shares to ARI, we 
do not reach LAR’s subissues regarding the six hundred additional shares.[85]  We overrule LAR’s sole issue.
III. 
Conclusion
        We 
reverse the part of the trial court’s judgment against (CNB) that awards (ARI) 
damages for DTPA violations, damages for loss of credit reputation, and trial 
and appellate attorney’s fees. We reverse the part of the trial court’s 
judgment against Don Lawson that awards ARI damages for loss of credit 
reputation.
        We 
render judgment that ARI is entitled to recover $160,520.69 in actual damages on 
its fraud claim, which is the jury verdict of $172,602.89 for ARI’s actual 
damages less 7%, or $12,082.20, that the jury attributed to ARI's own fault in 
causing the damages; plus prejudgment interest. Of the $160,520.69 and 
prejudgment interest,
 
a.     CNB 
is liable for $82,849.39 plus prejudgment interest, based on the jury finding 
that CNB bears a 48% share of responsibility for ARI’s actual damages;
 
b.     CNB 
and Bed & Bath are jointly and severally liable for $51,780.87 plus 
prejudgment interest, based on the jury findings that Bed & Bath bears a 38% 
share of responsibility for ARI's actual damages and that CNB and Bed & Bath 
engaged in a conspiracy; and
 
c.     CNB 
and Don Lawson are jointly and severally liable for $25,890.43 plus prejudgment 
interest, based on the jury finding that Don Lawson bears a 15% share of 
responsibility for ARI's actual damages and the directed verdict that CNB is 
vicariously liable for Lawson's acts.

 
        We 
also render judgment that ARI is entitled to recover exemplary damages of 
$317,000 from CNB and exemplary damages of $65,000 from Don Lawson.
        We 
affirm the remainder of the trial court’s judgment, excluding the amount of 
prejudgment interest attributable to CNB and Lawson. We reverse and remand the 
case to the trial court for recalculation of prejudgment interest attributable 
to CNB and Lawson and for entry of judgment in accordance with this opinion.
 
 
                                                          LEE 
ANN DAUPHINOT
                                                          JUSTICE

 
PANEL 
A:   CAYCE, C.J.; DAUPHINOT, J.; and SAM J. DAY, J. 
(Retired, Sitting by Assignment).
 
CAYCE, 
C.J., concurs in result only.
 
DELIVERED: 
March 11, 2004

 
NOTES
1.  
For convenience, we will refer to ARI and its principals collectively as 
“Appellees,” and, where necessary, individually.
2.  
Tex. Bus. & Com. Code § 
17.49(g) (Vernon Supp. 2004) (emphasis added).
3.  
Teel Bivins et al., The 1995 Revisions to the DTPA: Altering the Landscape, 
27 Tex. Tech L. Rev. 1441, 1447 
(1996).
4.  
Id. at 1453.
5.  
Tex. Bus. & Com. Code § 
17.49(g).
6.  
Roark v. Stallworth Oil & Gas, Inc., 813 S.W.2d 492, 496 (Tex. 
1991).
7.  
Black’s Law Dictionary 306-07 
(6th ed. 1990).
8.  
See Tex. Bus. & Com. Code 
§ 17.49(g).
9.  
See State v. Southwestern Bell Tel. Co., 526 S.W.2d 526, 528 (Tex. 1975); 
In re Talco-Bogata Consol. Indep. Sch. Dist. Bond Election, 994 S.W.2d 
343, 347 (Tex. App.—Texarkana 1999, no pet.).
10.  
Birchfield v. Texarkana Mem’l Hosp., 747 S.W.2d 361, 367 (Tex. 1987).
11.  
See id.
12.  
Fort Worth Indep. Sch. Dist. v. City of Fort Worth, 22 S.W.3d 831, 844 
(Tex. 2000).
13.  
See Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 180-81 (Tex. 
1997).
14.  
See Tex. R. App. P. 
47.1.
15. 
T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 220-21 (Tex. 
1992); Salinas v. Fort Worth Cab & Baggage Co., 725 S.W.2d 701, 704 
(Tex. 1987); see generally William Powers, Jr. & Jack Ratliff, Another 
Look at “No Evidence” and “Insufficient Evidence,” 69 Tex. L. Rev. 515, 530 (1991).
16. 
See Tex. R. App. P. 
33.1(a).
17. 
Bradford v. Vento, 48 S.W.3d 749, 755 (Tex. 2001).
18. 
Id.
19. 
Lesikar v. Rappeport, 33 S.W.3d 282, 299 (Tex. App.—Texarkana 2000, 
pet. denied); Hoggett v. Brown, 971 S.W.2d 472, 487 (Tex. App.—Houston 
[14th Dist.] 1997, pet. denied); Ralston Purina Co. v. McKendrick, 
850 S.W.2d 629, 635-36 (Tex. App.—San Antonio 1993, writ denied).
20. 
See Mfrs. Hanover Trust Co. v. Kingston Investors Corp., 819 S.W.2d 607, 
610 (Tex. App.—Houston [1st Dist.] 1991, no writ); Nautical 
Landings Marina, Inc. v. First Nat’l Bank, 791 S.W.2d 293, 299 (Tex. 
App.—Corpus Christi 1990, writ denied).
21. 
Transp. Ins. Co. v. Faircloth, 898 S.W.2d 269, 276 (Tex. 1995).
22. 
Id.
23. 
See Hoggett, 971 S.W.2d at 487.
24. 
See Am. Med. Int’l, Inc. v. Giurintano, 821 S.W.2d 331, 338 
(Tex. App.—Houston [14th Dist.] 1991, no writ).
25. 
See Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co., 77 S.W.3d 
253, 262 (Tex. 2002); Bradford, 48 S.W.3d at 754; Uniroyal Goodrich 
Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998) (citing Robert W. 
Calvert, "No Evidence" and "Insufficient Evidence" 
Points of Error, 38 TEX. L. REV. 361, 362-63 (1960)), cert. denied, 526 
U.S. 1040 (1999); Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 
450 (Tex. 1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996); In 
re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (all pertaining 
to legal standard); Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 
(Tex.), cert. denied, 525 U.S. 1017 (1998); Garza v. Alviar, 395 
S.W.2d 821, 823 (Tex. 1965) (both pertaining to factual standard).
26. 
See Tex. R. App. P. 47.1.
27. 
Mead v. Johnson Group, Inc., 615 S.W.2d 685, 688 (Tex. 1981); Duval 
County Ranch Co. v. Wooldridge, 674 S.W.2d 332, 336 (Tex. App.—Austin 
1984, no writ) (extending Mead rationale to causes of action involving 
fraud).
28. 
St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co., 974 S.W.2d 51, 53 
(Tex. 1998).
29. 
Id.
30. 
See Roberts v. U.S. Home Corp., 694 S.W.2d 129, 134 (Tex. App.—San 
Antonio 1985, no writ).
31. 
See id.
32. 
See id.
33. 
Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791, 794 (1955); see 
Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001) (holding jury may not 
reasonably infer ultimate fact from meager circumstantial evidence merely 
raising any number of inferences, none more probable than another).
34. 
Rocor, 77 S.W.3d at 262; Bradford, 48 S.W.3d at 754; Uniroyal 
Goodrich Tire Co., 977 S.W.2d at 334; Cazarez, 937 S.W.2d at 450; Leitch, 
935 S.W.2d at 118; In re King's Estate, 244 S.W.2d at 661.
35. 
See Auto. Ins. Co. v. Davila, 805 S.W.2d 897, 908 (Tex. App.—Corpus 
Christi 1991, writ denied) (holding that the plaintiff’s unsupported opinion 
that her credit “was ruined” was insufficient to support damages).
36. 
See Roberts, 694 S.W.2d at 135.
37. 
See id. (citing McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710 
(1943) (stating that loss of earning capacity is best shown by comparing actual 
earnings before and after injury)); Village Square Ltd. v. Barton, 660 
S.W.2d 556 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.) (stating that loss 
of value of business is impossible to ascertain without facts, figures, and data 
of the “going business” to compare with the present one).
38. 
Tex. Civ. Prac. & Rem. Code Ann. 
§ 41.003(a)(1) (Vernon 1997).
39. 
Id. § 41.001(2); accord Transp. Ins. Co. v. Moriel, 879 S.W.2d 
10, 31 (Tex. 1994).
40. 
In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); State v. Addington, 
588 S.W.2d 569, 570 (Tex. 1979); In re D.T., 34 S.W.3d 625, 630 (Tex. 
App.—Fort Worth 2000, pet. denied) (op. on reh’g).
41. 
Addington, 588 S.W.2d at 570.
42. 
In re J.F.C., 96 S.W.3d 256, 265 (Tex. 2002).
43. 
Id. at 266.
44. 
Id.
45. 
Id.
46. 
Id.
47. 
Id.
48. 
In re C.H., 89 S.W.3d 17, 25 (Tex. 2002).
49. 
Id.
50. 
Id. at 28.
51. 
Moriel, 879 S.W.2d at 31; Peco Constr. Co. v. Guajardo, 919 S.W.2d 
736, 742 (Tex. App.—San Antonio 1996, writ denied).
52. 
Ellis, 971 S.W.2d at 406; Baribeau v. Gustafson, 107 S.W.3d 52, 61 
(Tex. App.—San Antonio 2003, pet. denied).
53. 
Moriel, 879 S.W.2d at 30; Baribeau, 107 S.W.3d at 61.
54. 
Tex. Civ. Prac. & Rem. Code Ann. 
§ 41.003(a)(1).
55. 
Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981).
56. 
Tex. Civ. Prac. & Rem. Code Ann. 
§ 41.011; Kraus, 616 S.W.2d at 910.
57. 
S.W. Inv. Co. v. Neeley, 452 S.W.2d 705, 708 (Tex. 1970); Gray v. 
Allen, 41 S.W.3d 330, 332 (Tex. App.—Fort Worth 2001, no pet.); Transmission 
Exch., Inc. v. Long, 821 S.W.2d 265, 272 (Tex. App.—Houston [1st 
Dist.] 1991, writ denied).
58. 
Baribeau, 107 S.W.3d at 63.
59. 
Tex. Civ. Prac. & Rem. Code Ann. 
§ 41.008(b) (Vernon Supp. 2004) (emphasis added).
60. 
BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 116 S. Ct. 1589, 1598 
(1996); Baribeau, 107 S.W.3d at 63.
61. 
Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 45 (Tex. 1998) 
(adopting Gore factors).
62. 
State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 123 S. Ct. 
1513, 1524 (2003).
63. 
See Malone, 972 S.W.2d at 39-40.
64. 
See Tex. Civ. Prac. & Rem. 
Code Ann. § 41.008(b).
65. 
See Campbell, 123 S. Ct. at 1526 (reversing exemplary damages award that 
violated defendant’s due process rights); Moriel, 879 S.W.2d at 30 
(stating that we can only reverse exemplary damages if evidence is factually 
insufficient).
66. 
Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 552 (Tex. 1985), 
modified on other grounds, Johnson & Higgins, Inc. v. Kenneco Energy, 
Inc., 962 S.W.2d 507, 530 (Tex. 1998).
67. 
See Johnson & Higgins, 962 S.W.2d at 528.
68. 
See id. at 530.
69. 
Miga v. Jensen, 25 S.W.3d 370, 381 (Tex. App.—Fort Worth 2000), aff’d 
in part and rev’d in part, 96 S.W.3d 207 (Tex. 2002).
70. 
See Johnson & Higgins, 962 S.W.2d at 531.
71. 
Tex. Fin. Code Ann. § 304.104 
(Vernon Supp. 2004); Johnson & Higgins, 962 S.W.2d at 531 (adopting 
these statutory dates for determination of prejudgment interest under common 
law).
72. 
Qwest Communications Int’l, Inc. v. AT & T Corp., 114 S.W.3d 15, 
39-40 (Tex. App.—Austin 2003, pet. filed) (emphasis added).
73. 
Id.; see also Thrift v. Hubbard, 44 F.3d 348, 362 (5th Cir. 
1995) (holding that prejudgment interest accrued on emotional distress claim 
from time complaint was amended to assert it); but see Brownsville 
Pediatric Ass’n v. Reyes, 68 S.W.3d 184 (Tex. App.—Corpus Christi 2002, 
no pet.) (holding that prejudgment interest against defendant added after suit 
was filed should be computed from the date the original suit was filed).
74. 
Tex. Dep’t. of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990).
75. 
Id.
76. 
See Tex. R. Civ. P. 278; Triplex 
Communications, Inc. v. Riley, 900 S.W.2d 716, 718 (Tex. 1995).
77. 
Phillips v. Phillips, 820 S.W.2d 785, 789 (Tex. 1991); Tex. R. Civ. P. 94.
78. 
Perez v. Briercroft Serv. Corp., 809 S.W.2d 216, 218 (Tex. 1991).
79. 
See Earth Sci., Co. v. Lindley Int'l, Inc., 650 S.W.2d 217, 218 
(Tex. App.—San Antonio 1983, no writ) (ratification adequately pleaded where 
plaintiff alleged necessary elements despite not specifically using legal term 
of ratification).
80. 
Tex. R. App. P. 38.1(h).
81. 
Tex. Mexican Ry. Co. v. Bouchet, 963 S.W.2d 52, 54 (Tex. 1998).
82. 
Hall v. Stephenson, 919 S.W.2d 454, 466-67 (Tex. App.—Fort Worth 1996, 
writ denied); Happy Harbor Methodist Home, Inc. v. Cowins, 903 S.W.2d 
884, 886 (Tex. App.—Houston [1st Dist.] 1995, no writ).
83. 
Hall, 919 S.W.2d at 467; see also Fredonia State Bank v. Gen. Am. Life 
Ins. Co., 881 S.W.2d 279, 284 (Tex. 1994) (discussing “long-standing 
rule” that point may be waived due to inadequate briefing).
84. 
See Bradford, 48 S.W.3d at 754; Cazarez, 937 S.W.2d at 450; 
Leitch, 935 S.W.2d at 118.
85. 
See Tex. R. App. P. 
47.1.